**In re PENN–DIXIE INDUSTRIES, INC. and Penn-Dixie Steel Corporation, Debtors.**

**Bankruptcy Nos. 80 B 10472, 80 B 10473.**

United States Bankruptcy Court, S. D. New York.

March 13, 1981.

Fried, Frank, Harris, Shriver & Jacobson, New York City, for debtor; Jeffrey P. Meyer, New York City, of counsel.

Battle, Fowler, Jaffin, Pierce & Kheel, New York City, for Midwest Rubber Reclaiming Co.; Lawrence Mittman, New York City, of counsel.

Dickstein, Shapiro & Morin, New York City, for Medical Tribune GmbH; Leonard Garment, New York City, of counsel.

Jerome Feller, Asst. Regional Administrator, Securities and Exchange Commission, and Laura Corsell, New York City, for S. E. C.

BURTON R. LIFLAND, Bankruptcy Judge.

## MEMORANDUM OPINION

I. *BACKDROP AND FACTS*

On April 7, 1980, Penn-Dixie Industries, Inc. ("Penn-Dixie" or "Debtor") and its

wholly-own subsidiary, Penn-Dixie Steel Corporation, filed for reorganization under Chapter 11 of the Bankruptcy Code.[1] This proceeding, pursuant to § 1102(c), concerns a third attempt (by the debtors or a party related to them) to prune the membership of an appointed reorganization committee.[2]

At the behest of Midwest Rubber Reclaiming Company ("Midwest"), the United States Trustee[3] was directed to form a committee of Penn-Dixie equity security holders ("Committee"). § 151102(b). Among those appointed were Midwest and Medical Tribune, GmbH, ("Medical"), respectively, the two largest stockholders of Penn-Dixie.

Shortly thereafter, the Debtor moved to disqualify Midwest from Committee service on the ground of conflicting interests (i. e., an alleged goal to seize control of Penn-Dixie). By a cross motion to dismiss, Midwest protested that the Debtor had failed to allege a *prima facie* case, and further, that the Debtor lacked standing to challenge the Committee's composition. Following a hearing, on the basis of findings of fact and conclusions of law made on the record, the Debtor's motion was denied, and Midwest's cross motion was granted on both grounds (though primarily upon the first). On appeal, the Honorable John M. Cannella upheld this court's ruling on the merits, but declined to agree with my view that the Debtor lacked standing. *In re Penn-Dixie*, 9 B.R. 936, No. 80 Civ. 5248 (S.D.N.Y. February 10, 1980).

While the above appeal was pending, Midwest (reacting to the previous challenge to its membership) moved to debar its fellow committee member, Medical, from the Committee on the basis of Medical's ties to the Debtor. In rebuttal, Medical filed its own motion to remove Midwest from the Committee, which is essentially a mirror image of Penn-Dixie's initial unsuccessful Midwest disqualification motion and was apparently designed to forestall the standing issue. The Securities and Exchange Commission ("SEC"), intervening once again under § 1109(a) (the SEC supported Penn-Dixie's previous motion), agreed with both Midwest and Medical and moved for their simultaneous expulsion. At the conclusion of a hearing on the combined motions, decision was reserved.

Medical is a West German corporation[4] with two managing directors (geshaftsfuhrers), one of which is Michael R. Sonnenreich. As a geshaftsfuhrer, Sonnenreich reviews and approves yearly all decisions and activities of the other geshaftsfuhrer. In 1979, this included Medical's purchase of Penn-Dixie stock, which is under Sonnenreich's control as beneficial owner with the power to vote and manage.[5] Sonnenreich is also a member of Penn-Dixie's Board of Directors, as well as two of its key governing committees, the Executive and Audit Committees, (the latter of which he is chairman). In this role, Sonnenreich has admit-

1. Title I of the Bankruptcy Reform Act of 1978, Pub.L. 95–598, 92 Stat. 2683, enacted and codified as Title 11 of the United States Code the "Bankruptcy Code", and all section references herein may be found in Title 11, unless otherwise indicated.

2. Not discussed in this opinion is the debtors' earlier motion for the removal of Armco, Inc. from the committee of unsecured creditors of Penn-Dixie Steel Corporation. The application alleged a conflict in that Armco was a direct competitor, who, by exposure to confidential materials submitted to committee members, might steal Penn-Dixie customers and lessen competition. The debtors, apparently reaching some accommodation with what it perceived to be an offensive committee member, withdrew the application.

3. The Southern District of New York is one of ten groups of judicial districts in the experimental United States trustee program designed to relieve bankruptcy judges from some of their former administrative and supervisory roles, including committee appointments. See § 1501 *et seq.*, and §§ 224(a) and 408 of the Bankruptcy Reform Act of 1978.

4. Medical is organized in the form of a "Gesellschaft mit beschrankter Haftung" (GmgH), a German corporate entity without equivalence in the United States that shares attributes of both public and private corporations in the United States.

5. Statements of beneficial ownership filed with the SEC for the months of April and August of 1980.

ted involvement in recommending the Chapter 11 filing, selecting the Debtor's counsel, dealing with daily management affairs, negotiating with Penn-Dixie creditors, approving refinancing, approving the sale of major assets, developing strategies for dealing with the creditors' committees, formulating and approving the plan of confirmation, and seeking Midwest's removal. Deposition of Michael R. Sonnenreich, October 9, 1980 at 34–42. Medical's representative on the Equity Security Holder's Committee, Anthony J. Roccograndi, Esq., is a law partner of Sonnenreich in the firm of Sonnenreich & Morrell. And, the mailing address provided by Medical to the U.S. Trustee is Sonnenreich's law firm. In the words of the SEC, "the close link of Medical to PDI through Mr. Sonnenreich can hardly be disputed".[6] It is on the basis of these highly interconnected and interdependent relationships that Midwest has challenged Medical's right to serve on the Committee.

The SEC also moves for the dual removal on its observation that bitter internecine warfare between Midwest and Medical has made the Committee impotent. The SEC claims its motion is unrelated to its pending investigation.

## II. *DISCUSSION*

■ On request of a party in interest,[7] the court may order the creation of a committee of equity security holders (defined in 101(16) and (15)) if necessary to protect their interests. § 1102(b). In this district, committee appointments are made by the United States Trustee. § 151102(b). Ordinarily (and parallel to creditors' committees), this committee shall consist of those willing to serve holding the seven largest amounts of equity securities of the kind being represented. § 1102(b)(2).

No other guidelines for selecting committee members are provided. According to *Collier on Bankruptcy*, initial selection

should occur as close within the general confines of the statute as possible without making "*a priori*" judgement concerning potential conflicts. If there are conflicts, the preeminent bankruptcy treatise explains, a proper party may later raise the issue, and the court can resolve it under § 1102(c). 5 *Collier on Bankruptcy* ¶ 1102.3 at 1102–15 (15th Ed. 1980). Notwithstanding, the legislative history to § 1102 makes it clear that subsection (b) is "precatory", House Report No. 95–595, 95th Cong. 1st Sess. (1977) 401, U.S.Code Cong. & Admin. News 1978, p. 5787, thus allowing flexibility in assembling a committee.

Under § 1102(c), a party in interest may challenge a committee's ability to fairly and adequately represent equity security holders. If the court, in the exercise of its discretion, determines that the committee is not representative, it may alter the committee's makeup. As explained by subsection (c)'s legislative history: "This subsection is intended, along with the nonbinding nature of subsection (b), to afford the court latitude in appointing a committee that is manageable and representative in light of the circumstances of the case." House Report, *id.* at 402, U.S.Code Cong. & Admin.News 1978, p. 6357.

No doubt, an arrangement was intended whereby committee members, individually and as a group, would be representative of and loyal to shareholders as a whole as opposed to dissident factions of particular classes or interests. See *Collier supra* at 1102–14. An apposite section of the House Report, from which Congress' sentiment can be discerned, states:

> Because the purpose of a committee is to represent a class that is too large to speak for itself as a whole, inclusion of representatives from other classes would present a potential for conflict within the committee, and the danger of committee

---

**6.** SEC application for removal, Oct. 10, 1980 at 3.

**7.** "Party in Interest" is not defined by the Bankruptcy Code. Its meaning in a proceeding

is to be determined on an *ad hoc* basis. Compare § 1109 with the comment at 124 Cong. Rec. H 11090 (Sept. 28, 1978); S17407 (Oct. 6, 1978).

action being taken to the detriment of the class it is intended to represent. House Report, *supra* at 236, U.S.Code Cong. & Admin.News 1978, p. 6195. Unfortunately, as *Collier* goes out of its way to note, not alluded to at all by the Bankruptcy Code are potential intraclass conflicts of interest such as in the event that one or more of the seven largest shareholders are also creditors of the debtor or past or present officers or directors of the debtor. *Collier supra* at 1102–15. Nevertheless, the direction that this court must take is clear when the controversies *sub judice* are examined in the light of the role of reorganization committees.

Reorganization committees are the primary negotiating bodies for the plan of reorganization. They represent those classes of creditors or equity security holders from which they are selected. They also provide supervision of the debtor and execute an oversight function in the pursuit to protect constituents' interests. House Report No. 95–595, 95th Cong., 1st Sess. (1977) 401. An equity security holders' committee is vested with powers, duties, and functions identical to those granted to the statutorily mandated, more familiar, creditors' committees, and the fiduciary duties and responsibilities assumed by creditors' committee members, likewise apply to equity security committee members. Miller and Cook, *A Practical Guide to the Bankruptcy Reform Act* (1979) at 527; *See generally* 6 *Collier on Bankruptcy* (14th Ed.) ¶ 9.28 at 1731, N.21.

Empowered by § 1103(c), committees may (1) consult with the debtor concerning the administration of the case; (2) investigate the acts, conduct, assets, liabilities, financial condition and operation of the debtor's business, desirability of continuing the business, or any other relevant matter; (3) participate in the formulation of a plan, advise and make recommendations regarding the plan to those represented, and collect and file acceptances for the plan; (4) request the appointment of a trustee or examiner; and, (5) perform any other services that are in the interests of those represented. *See generally* 5 *Collier on Bankruptcy* (15th Ed.) ¶ 1103.07 at 1103–14 to 26. This is a wide and important array of authority and responsibility as the Bankruptcy Code contemplates a significant and central role for committees in the scheme of a business reorganization.

### III. a) *MOTION BY MIDWEST TO DISQUALIFY MEDICAL FROM SERVING ON THE COMMITTEE*

■ Given the above background, this court finds Medical's presence on the Committee unwarranted. Under the statutory scheme embodied in the Bankruptcy Code, Medical is perforce disabled from serving in a representative capacity. Its abyssal entanglement with the Debtor renders it unfit to monitor, scrutinize, investigate, and negotiate with the Debtor, key components of § 1103(c). No clearer impermissible conflict could be imagined.

Two cases arising under Chapter X of the former 1898 Bankruptcy Act dealing with committees organized to represent bondholders are apposite and in accord.[8]

In the first case, *In Re Realty Associates Securities Corp.*, 56 F.Supp. 1008 (E.D.N.Y. 1944) *aff'd* 156 F.2d 480 (2d Cir. 1946) a motion was brought to disqualify members of a "Bondholders Directors Committee". Members of this committee had served and continued to serve as directors of the corporate debtor. In disbanding the committee, the court opined:

It would seem sufficient disqualification that as directors they had been required to so far identify themselves with participation in the operations of the business of the debtor as to make them

---

8. Under Chapter X, committees were comparatively informal. See Bankruptcy Rule 10–211; §§ 209–13, (former) 11 U.S.C. §§ 609–613 of the Bankruptcy Act; 6 *Collier on Bankruptcy* (14th Ed.) ¶ 9.28; 13A *Collier, id.* at ¶ 10–211.03. Notwithstanding this, the conflict of interest principles developed thereunder provide sound precedent under the Bankruptcy Code.

partisan on any issues which may arise as to the propriety of such operation.

*Id.* at 1009.[9]

This message is equally instructive here, where a single director of the corporate debtor has been interposed in a manner tantamount to having established a seat on the Committee. "[I]t is clear that such past relationship will give rise to conflicting loyalties...".[10] *Id. Cf. In re International Ry. Co.*, 86 F.Supp. 546 (W.D.N.Y.1949). (loyalties to those with conflicts of interest is itself a disqualification on the same basis).

The second case, *Woods v. City National Bank & Trust Co.*, 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820, *reh den* 312 U.S. 715, 61 S.Ct. 736, 85 L.Ed. 1145 (1941), an often cited landmark conflict of interest decision, contains a similar, straightforward, principle: just as the Supreme Court found that a bondholders' committee requires a committee freed from the influence of the underwriter in order to be able to scrutinize and fully enforce the underwriter's liability, so too does an equity security holders' committee need a committee free from the influence of the debtor's management so as to be able to fully investigate, scrutinize, and negotiate with the Debtor. The facts reveal a severe intertwinement of Medical and the Debtor. Not even a myriad of protective orders under § 107 and Bankruptcy Rule 918 could effectively shield Committee members from Medical's influence, which may be subliminal and unwittingly passing on the Debtor's views, or could guarantee confidentiality of Committee proceedings vis a vis the Debtor. "Lack of loyalty is not as much an openly expressed attitude of mind but a subconscious attitude which may generate later". *International Ry. Co., supra* at 547–548. Invoking simple colloquial imagery, to allow Medical to remain on the Committee would be as risky as leaving a fox to guard the chicken coop. The Medical-Sonnenreich connection is anything but nominal, and Sonnenreich is pivotal in effecting the Debtor's Chapter 11 rehabilitory attempt, an activity that should be kept isolated from Committee functions.[11] The motion to disqualify Medical is granted.

b) *MOTION BY MEDICAL TO DISQUALIFY MIDWEST FROM SERVING ON THE COMMITTEE*

Medical's motion was fully disposed of by the district court's appellate review of Penn-Dixie's near identical motion. No end would be served by further comment in the face of unchanged circumstances.[12] The motion to disqualify Midwest is denied.

c) *MOTION BY SEC FOR SIMULTANEOUS REMOVAL OF BOTH MIDWEST AND MEDICAL FROM SERVING ON THE COMMITTEE*

■ Having determined that one party, Medical, should be removed from the Committee, the SEC's rationale for simultaneous removal is no longer valid. Without

9. Medical would have the court believe that bondholders and stockholders have an inherent conflict that makes it impossible for directors of stockholders to give undivided loyalty and allegiance to bondholders, but since both an equity securities committee and directors owe a duty of undivided allegiance to shareholders, there is no conflict. Given the adversarial posture imposed by § 1103(c) between a committee of equity security holders and a debtor, this court cannot agree.

10. Midwest's apropos remark is well taken. "... Sonnenreich-Medical serving both the debtors and the equity security holders will as Homer's Odysseus, undoubtedly be caught between the respective terrors of Scylla and Charybdis." Affidavit of Morris Weisman, Sept. 10, 1980 at 3.

Moreover, there is no need to speculate as to the degree of conflict. *See Woods, infra* 312 U.S. at 268, 61 S.Ct. at 497.

11. The integrity of the parties is not challenged or questioned. The court only determines that Medical is in a conflict position.

12. Further cases of interest in this area include *Matter of Schatz Federal Bearings Co., Inc.*, 6 BCD 692, 2 CBC2d 741, 5 B.R. 543 (Bkcy.Ct.S. D.N.Y., 1980, Schwartzberg, B. J.); *In re Realty Associates Securities Corp.*, 61 F.Supp. 574 (E.D.N.Y.1945).

two to tango [tangle], the Committee should now be "manageable".[13]

Midwest is directed to settle an order on five days notice.

13. With the benefit of hindsight review, following some initial gamesmanship in choosing their counsel, the Committee has operated in harmony without incident. The SEC's expressed fears of impotence from conflict and internecine warfare have not materialized. As expressed by the debtor in recently filed papers with this court covering the proceedings involving the equity committee and its counsel, "The [Debtor] Law Firm . . . is now consulting and working amicably with the equity committee and its counsel in connection with the formulation of a plan of reorganization". Allowance application of Debtor's counsel by Herbert P. Minkel, Jr., dated January 22, 1981. Nothing expressed in this opinion should be construed as a bar to appropriate Committee consultation with Medical as an ex-officio member or otherwise.