**In re TUCKER FREIGHT LINES, INC., Debtor.**

**CENTRAL TRANSPORT, INC., a Michigan corporation, Plaintiff,**

**v.**

**Elizabeth ROBERTO, et al., individuals, jointly and severally, Defendants.**

**Bankruptcy No. HK 83 02391.
Adv. No. 85 471.**

United States Bankruptcy Court,
W.D. Michigan.

May 22, 1986.

See also, Bkrtcy., 62 B.R. 210.

Daniel F. Berry, Michael A. Nedelman, Frederic A. Smith, Simpson & Moran, Birmingham, Mich., for plaintiff.

John D. Tully, Patrick E. Mears, Warner, Norcross & Judd, Grand Rapids, Mich., for defendants.

## OPINION

LAURENCE E. HOWARD, Bankruptcy Judge.

## LIABILITY OF MEMBERS OF THE CREDITORS' COMMITTEE

This lawsuit arises from the bankruptcy case of Tucker Freight Lines, Inc., which is still pending, and from various proceedings in that case before this Court.

The defendants, Elizabeth Roberto, Walter L. Wittenberg, Durwood Young, Lawrence Parrott, Kevin Cash, William A. Nolan, Michael L. Fayette, Nancy Loomis, Lonnie Wilson, Richard Nelson and James Curcio, sat on the debtor's Official Unsecured Creditors' Committee as delegates of certain member creditors. Elizabeth Roberto served as chairperson. The plaintiff, Central Transport, Inc., the debtor's sole shareholder and also an unsecured creditor, has filed suit against these defendants individually, alleging that they unlawfully and intentionally or recklessly committed tortious acts which resulted in the denial of confirmation of the debtor's plan of reorganization and eventual conversion to a case under Chapter 7 of the Bankruptcy Code. The defendants have moved for summary judgment on the ground that as members of the Creditors' Committee they hold absolute immunity from such suits.

The debtor filed its petition under Chapter 11 of the Bankruptcy Code on September 16, 1983. The debtor proposed a disclosure statement and a plan of reorganization. At the hearing on the disclosure statement the Creditors' Committee objected to the disclosure statement and the Court permitted the Committee to include in the ballot package a letter recommending that creditors vote against acceptance of the plan of reorganization. This letter was prepared and sent without any review of the text by the Court. The letter made statements concerning the good faith of the debtor, tax advantages Central Transport would gain, the debtor's multi-employer pension plan withdrawal liability, and a proposed loan from Central Transport to the debtor. (Defendant's Exhibit 10). The debtor responded with a letter to the unsecured creditors denying the Committee's statements. More particularly, the response labelled claims of potential tax benefit to Central Transport "just plain wrong." (Defendants' Exhibit 11). Enclosed with the response was a letter to the unsecured creditors from a national accounting firm stating that Central Transport would clearly not be entitled to the net operating losses that were the foundation of the alleged tax benefits. (Defendants' Exhibit 12).

The unsecured creditors class rejected the plan. There were 190 unsecured creditors with claims totaling $394,912.85 who voted for the plan. However, 287 unsecured creditors with claims totaling $11,-478,447.34 voted against the plan. Subsequently, the case was converted to one under Chapter 7.

This suit arose from the Creditors' Committee's letter and the rejection of the plan by the unsecured creditors. Central Transport filed the complaint in the District Court for the Western District of Michigan on November 21, 1985. The complaint alleged that the Committee letter made statements the defendants knew or should have known were false and misleading. The complaint further alleged that the letter resulted from a fraudulent scheme committed by the defendants in violation of their fiduciary duty as members of the Unsecured Creditors' Committee, and in violation of the Securities Exchange Act of 1934 15 U.S.C. § 78a et. seq., and in violation of Title IX of the Organized Crime Control Act of 1970, otherwise known as the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. §§ 1961–1968. The defendants asserted an alleged absolute immunity for members of a creditors' committee as a defense. After a series of difficult hearings, the Honorable Richard Enslen, District Court Judge, referred this case to this Bankruptcy Court on the ground that it was best able to determine whether such an absolute immunity exists. According to Judge Enslen's opinion, should this Court conclude there is no doctrine of absolute immunity Central Transport may then petition for withdrawal of the reference.

As this is a motion for summary judgment, "the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant," and "the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated." *Tee-pak, Inc., v. St. Regis Paper Company,* 491 F.2d 1193, 1195 (6th Cir.1974) (quoting *Bohn Aluminum and Brass Corporation v. Storm King Corporation,* 303 F.2d 425, 427 (6th Cir.1962)). Accordingly, the Court must assume that the Committee letter contained intentionally and tortiously false and misleading statements made as a result of an illegal conspiracy formed by the defendants. The defendants' attorney has conceded this point at the hearing on this motion (Transcript at p. 22).

Although the term "absolute immunity" has been used a bit loosely in these proceedings, the defendants do not ask for carte blanche. Rather, they argue that as they were acting pursuant to the Bankruptcy Code and to this Court's permission they should be absolutely immune from the claims asserted in the plaintiff's Complaint. The defendants further argue that if the Bankruptcy Code is to function creditors' committees must share the same absolute immunity held by judges and trustees.

The Bankruptcy Code provides that a creditors' committee may "advise those represented by such committee of such committee's determinations as to any plan formulated." 11 U.S.C. § 1103(c).[1] This may be an implicit grant of limited immunity. However, implied in this grant of authority must also be a concurrent fiduciary duty to all the unsecured creditors. Blain and Erne, *Creditors' Committees Under Chapter 11 of the United States Bankruptcy Code: Creation, Composition, Powers and Duties,* 67 Marq.L. Rev. 491, 514 (1984). At a minimum, this fiduciary duty requires that the committee's determinations must be honestly arrived at, and, to the greatest degree possible, also accurate and correct. For a Creditors' Committee to urge rejection of a plan for reasons they knew, or would have known but for their recklessness, to be false would violate this duty and deprive them of any limited immunity they might otherwise hold under § 1103(c)(3).

The only explicit grant of immunity in the Bankruptcy Code is found at 11 U.S.C. § 1125(e), which confers immunity from violations of any law, rule or regulation covering the sale of securities upon anyone who in good faith solicits rejection of a plan. This good faith standard would immunize even negligent conduct. 5 King, *Collier on Bankruptcy,* ¶ 1125.03, at 1125–38 (15th ed. 1986). But these allegations, if correct, by their nature contradict the good faith required for protection under § 1125 (e).[2]

The defendants also argue that they should be immune because the issues raised in the letter were raised at the disclosure hearing during which the Court gave them permission to send the letter. Many issues were raised during that hear-

---

1. It is for this reason that this Court has traditionally allowed the creditors' committees to include a letter to creditors in the disclosure statement and ballot package. This Court believes that to be the most efficient way for the creditors' committees to communicate with their constituents.

2. The Court would also note that if the Creditors' Committee's letter, or the debtor's rebuttal letter, were found to be an unauthorized disclosure statement then that might also be grounds for denial of the § 1125(e) "safe haven" of securities law immunity. *Collier's supra,* ¶ 1125.03 at p. 1125–40.

ing, but the chief concerns were who, if anyone, was to get the tax benefit of the net operating loss carry forward, the amount of any potential liability for the debtor's possible withdrawal from the Central States Southwest Pension and Health and Welfare Funds (Central States) and whether or not collection of fraudulent transfers and preferences under the proposed plan would yield a single penny for the unsecured creditors. As to this last item, the Creditors' Committee maintained that its analysis showed that the collection of transfers and preferences would be fruitless; the debtor said it didn't know and would accept the committee's analysis. (Transcript at pp. 46–49). The Court suggested that the Committee should set forth in a letter its analysis showing that collection of the alleged transfers and preferences would not yield a dividend and recommending to the unsecured creditors that they therefore vote against the plan. The Court then suggested that the letter be included in the disclosure statement and ballot package. (Transcript at pp. 49, 55). The debtor's attorney agreed to this. But the letter sent out by the Creditors' Committee made statements on many other issues. The fact that the letter exceeded the scope contemplated by the Court and opposing counsel does not make it per se illegal or fraudulent, but neither can those statements be considered as authorized or permitted by the Court or opposing counsel. True, these issues were raised at the hearing, but they were never resolved. Debtor's counsel did not concede on the main issues that the creditors were correct, nor did the Court so hold.[3]

█ The defendants have also argued that if the Bankruptcy Code is to function the members of the Creditors' Committee must have the same absolute immunity that trustees do. However, trustees do not have "absolute" immunity; they may be held personally responsible for intentional wrongs. *Mosser v. Darrow,* 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951). Although the Sixth Circuit and the Ninth Circuit disagree on whether a trustee may also be held responsible for negligent wrongs, it is settled that debtors in possession must live by the same standard as trustees. *Ford Motor Credit Company v. Weaver,* 680 F.2d 451 (6th Cir.1982); *Hall v. Perry (In re Cochise College Park),* 703 F.2d 1339, 1357 n. 26 (9th Cir.1983); *Robbins v. Schuyler (In re United Equipment Sales Co.)* 47 B.R. 818 (Bankr.W.D.Mich.1985). A trustee has immunity only if his actions are within the scope of the authority conferred upon him by statute or the court. *Weissman v. Hassett,* 47 B.R. 462 (Bankr. S.D.N.Y.1985). The assumed tortious acts

**3.** In addition to the collection of fraudulent transfers and preferences discussed in the text, the other issues raised both in the letter and the hearing were withdrawal liability from the pension fund and who would get the tax benefit, if any, of the net operating loss carry forward. As to the withdrawal liability, the disclosure statement asserted none would be incurred unless the case were converted to a Chapter 7. The defendants contended, however, that not only would liability be incurred in both a Chapter 11 and a Chapter 7, but that the liability under a confirmed Chapter 11 would be far greater than in a Chapter 7. The Court never resolved this conflict, nor did it direct that the disclosure statement be changed to reflect this conflict, but rather approved the statement as it stood. (Transcript pp. 9–10, 22–23, 59).

The most contested issue was the net operating loss carry forward tax advantage. Given Tucker's dismal performance in the years leading up to its petition in bankruptcy, it had an excellent net operating loss. The proposed plan called for the sole shareholder, Central Transport, to surrender its stock. It would then pay $250,000 to the debtor in return for new stock. The defendants feared that by some accounting alchemy Central Transport would then be able to effectively slide that loss from Tucker's balance sheet to Central Transport's. The defendants were never explicit as to how this might be done. (Transcript at pp. 28–29). As for Central Transport, the debtor's attorney admitted Central Transport was the sole shareholder, and that the net operating loss was of value to the debtor. But he denied that it was worth as much as the defendants claimed, asserted that it could belong only to the debtor, and further maintained that it would be worthless unless the debtor again became an operating entity. (Transcript, pages 7, 10, 15–16, 20, 25–26, 28–29, 41–43, 51–52). Again, the Court neither resolved this issue, nor did it direct that the disclosure statement be changed, nor did it authorize a statement on the subject in the letter from the Creditors' Committee.

are not with the scope of authority of a trustee, a debtor in possession, or a creditors' committee.

■ The defendants' last argument is that the letter could not have caused the plaintiff any harm, no matter what its contents were. Under this argument, the letter is irrelevant because the defendants sat on the Creditors' Committee as representatives of certain creditors. These creditors held enough debt to control the vote and defeat the plan even if all the other creditors voted for the plan. Indeed, one creditor alone, the Central States pension plan, with a claim of $9,047,721.36, could alone defeat the plan. As the plaintiff observes, however, this argument rests upon two assumptions, that the creditors represented on the committee controlled the class, and that the representatives sitting on the committee as agents controlled their principals' votes. Passing over the first assumption,[4] the second raises the question of who actually determined how the creditors' votes were to be cast, and how those determinations were made. The creditors represented on the Committee might have made those decisions independently of their delegates, or they might have made them in reliance upon their delegates' allegedly fraudulent representations. This is a factual question the Court is unable to answer from this record.

The Bankruptcy Code confers a limited immunity upon those serving its ends, but it does not create any absolute immunity. Therefore, as a matter of law the defendants' motion for summary judgment must be denied. As to whether the defendants actually caused any harm to the plaintiff, that is a factual question which also precludes summary judgment.

4. The plaintiff argues that many of the unsecured creditors represented on the Committee had contingent, unliquidated claims by their own admission and that they therefore had an affirmative duty to have those claims estimated for voting purposes. 11 U.S.C. § 502(c)(1). The plaintiff contends that estimation, which was not asked for by anyone, would have reduced or outright disallowed the votes of those creditors.

That may be true. However, these votes were counted and neither the debtor nor Central Transport filed an objection or appeal on those grounds. However, even if Central Transport looses on this argument, summary judgment would still be precluded by the pivotal question of whether the Creditors' Committee delegates procured the negative votes of their principals through fraudulent misrepresentations.