**In re DREXEL BURNHAM LAMBERT GROUP, INC., et al., Debtors.**

**Bankruptcy No. 90 B 10421.**

United States Bankruptcy Court, S.D. New York.

March 4, 1992.

C.D. Montgomery, of Milgrim, Thomajan & Lee, P.C., New York City, for the Official Committee of Equity Sec. Holders.

E. Schallert, Debevoise & Plimpton, New York City, for Lambert Brussels Associates (LBA).

A. Miller and P. Gruenberger, of Weil, Gotshal & Manges, New York City, for debtors.

## MEMORANDUM OF DECISION ON § 510(b) OBJECTIONS TO PLAN CONFIRMATION

FRANCIS G. CONRAD, Bankruptcy Judge.[*]

LBA, holder of about 40 percent of the common stock of Drexel Burnham Lambert Group, Inc., objects [1] to confirmation of the Joint Plan of Reorganization ("Plan") on the grounds that it fails to relegate employee shareholders to LBA's place at the bottom of the Plan distribution heap. This omission, LBA argues, violates the mandatory subordination requirements of 11 USC § 510(b),[2] which results in unfair discrimination under § 1129(b),[3] thereby rendering the plan unconfirmable under § 1129(a)(1).[4] LBA also objects to the Plan insofar as it releases members of the Equity Committee and its counsel from any liability for actions taken in connection with the Debtors' reorganization, except claims arising from "willful misconduct," *First Amended and Restated Joint Plan of Reorganization,* § 12.2, and enjoins any suits against such

[*] Sitting by Special Designation.

1. Our subject matter jurisdiction over this matter arises under 28 U.S.C. § 1334(b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(A), (L), and (O). This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52, as made applicable to this proceeding by F.R.Bkrtcy.P. 7052.

2. Section 510(b) provides:
 (b) For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal to the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

3. Section 1129(b) provides, in pertinent part:
 [I]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted the plan.

4. Section 1129(a)(1) provides:
 (a) The court shall confirm a plan only if all of the following requirements are met:
 (1) The plan complies with the applicable provisions of this title.

persons for any reason. *Id.,* § 12.3(b). We deny both LBA objections.

### § 510(B) OBJECTION

■ Under the Plan, LBA's equity interest is assigned to Group[5] Class 8, of which LBA is the only member. LBA and Group Class 9, which consists of the equity interests of employees who hold Group common stock, are junior to all other classes and are allocated the smallest distributions under the Plan. Given the enormity of the gap between Drexel's liabilities and its assets, however, the proposed plan distributions to equity interests are, by any test, greater than the value of those interests, which we find to be worthless. Both Classes 8 and 9 receive the same treatment under the Plan for their respective interests, and receive distributions in amounts proportionate to those interests.

LBA voted to reject the Plan, thereby preserving its right to object that it is unfairly discriminated against under § 1129(b). The basis for its objection is that members of Group Class 9 also share in the distributions provided to Group Class 6C, estimated at $26 million. Class 6C consists of persons holding "DBL Group Shareholder ERISA/Compensation Claims." The persons holding such claims were defined by the Plan to include persons who (a) were employed by one of the Drexel debtors on the date Group filed its petition, and (b) who then held equity interests in Group, either directly or indirectly. Also included in Group Class 6C are the heirs or beneficiaries of such employees. The DBL Group Shareholder claims are but a part of the larger corpus of Employee ERISA/Compensation Claims,[6] which includes every conceivable claim by employees against any of the Drexel debtors, their officers, directors, employees, agents, or any custodian, trustee, or other fiduciary of the Drexel employee benefit plans

relating in any manner to the issuance, sale, purchase or repurchase, or ownership of DBL Group capital stock, war-

rants, convertible debentures or stock options to DBL Employees under any such plan, program or arrangement whether or not subject to ERISA, including, but not limited to, any deferred compensation trust or any custodial agreement in respect thereof, or to DBL Employees.

Plan Exhibit A, § 166. Debtor's counsel summarized the disparate nature of the claims covered in a hearing before us on January 30, 1992:

After bankruptcy, claims were asserted either by employees or on their behalf by committees or others in which a variety of claims were asserted against the firm[,] ... against [employee benefit] plans, fiduciaries of plans, officers and directors. The claims related principally to the purchase or acquisition of stock by employees, or the divestiture of stock by employees. For example, these claims allege that the employees should not have been allowed to purchase shares. Others said they were in effect forced, if you will, to purchase shares more or less as a condition to employment by the firm or to advancement in the employ of the firm. Some claimed they paid too much, others claimed they sold for too little. Some claimed they couldn't sell at all and others yet claim that they received the wrong kind of security in payment of the [employee benefit] plan. These allegations were premised upon a series of statutory and common law theories, ERISA theories, labor law theories, common law fraud theories and what have you.

Transcript of January 30, 1992, hearing, pp. 71–72. The common thread running through most of the claims, however stated, involves the illegal conduct, including insider trading, which eventually brought down the Drexel empire. Most claimants allege that the Debtors and plan fiduciaries should have known about the illegal activity, realized that it threatened the value of equity interests in Group, and acted to pro-

---

**5.** For convenience, "Group" shall refer to Drexel Burnham Lambert Group, Inc., and "Drexel" shall refer to the business organization of which Group and the other Debtors were a part.

**6.** Group Class 6A and 6B members hold the balance of the Employee ERISA/Compensation Claims, but their distributions under the Plan are not in issue.

tect the employees who held shares under Drexel benefit plans.

LBA argues that an Employee ERISA/Compensation claim "relating in any manner to the issuance, sale, purchase or repurchase of Group common stock", as the Plan in part describes such claims, is the definitional equivalent of a § 510(b) "claim ... for damages arising from the purchase or sale of ... a security" of the debtor. Accordingly, LBA contends, § 510(b) requires that interests in common stock must be subordinated to all senior claims, and to the same priority as other common stock. LBA's theory is that giving Class 6C members two different distributions for a single common stock interest, while LBA gets only one, violates § 510(b), resulting in unfair discrimination against LBA under § 1129(b), and making the Plan unconfirmable under § 1129(a).

We find several flaws in LBA's argument. First, its success depends upon a determination as to the merits of each of the varied and various Employee/ERISA Compensation Claims against the Drexel Debtors. LBA baldly asserts that § 510(b) overrides the provisions of ERISA, which protects employees' benefit plans from employer predations. We are not at all sure that LBA's position on this relatively novel issue is correct. Our research turned up only one case that dealt with the interplay between ERISA and § 510(b), *In re Lenco, Inc.*, 116 B.R. 141 (Bkrtcy.E.D.Mo.1990). That case is cited by LBA for two propositions: (a) that "section 510(b) applies to ERISA claims," *Reply of Lambert Brussels Associates Limited Partnership in Support of Its Objections to the Debtors' Joint Plan of Reorganization,* p. 16; and, (b) that such claims " 'must be subordinated' under section 510(b)." *Id.,* at 6, *quoting In re Lenco, supra,* 116 B.R. at 144.

In *Lenco,* all of the shares of an employee stock ownership plan (ESOP) were sold to a new owner as part of a buyout of the debtor corporation. The new owner purchased all 170,619 ESOP shares on April 5, 1984, for $19.10 per share. The next day, the new owner sold 178,019 shares back to the ESOP for the same price per share.

During the corporation's subsequent bankruptcy, the US Department of Labor (DOL) filed a proof of claim on behalf of the ESOP beneficiaries. The Unsecured Creditors' Committee moved to subordinate DOL's claim, under § 510(b). The parties stipulated that (a) the ESOP's repurchase of the shares for the same price per share it had received on selling them the day before was for more than they were worth, and (b) that the overpayment would have subjected the debtor to liability resulting in a distribution under the debtor's plan, absent subordination. Based on those facts, the Court held:

> In the instant case, all events which comprised the alleged misconduct took place within a two-day time period. This indicates that "all theories of recovery were based on the same set of operative facts and based on a continuing plan or scheme."
>
> . . . .
>
> [T]he DOL claim seeks compensation for the ESOP's overpayment of funds to [the new owner] in the sale of Lenco stock. Given that this claim is related to the purchase and sale of a security, this Court holds that the mandatory nature of section 510(b) dictates that the DOL's claim must be subordinated.

*In re Lenco, supra,* 116 B.R. at 144, *quoting In re Amarex,* 78 B.R. 605, 608 (W.D.Okla.1987). We do not believe, however, that the holding of *Lenco,* which appears to us to be entirely correct on the facts before that Court, can be generalized to resolve all of the multifaceted issues of law and fact involved in the many separate and distinct claims involved in the Employee ERISA/Compensation Claims Settlement. Indeed, the Court in *Lenco* at 144, n. 4, expressly noted that it did not "challenge the correctness" of *In re Amarex, supra,* 78 B.R. at 610, which held:

> Section 510(b) pertains only to claims based upon the alleged wrongful issuance and sale of the security and does not encompass claims based upon conduct by the issuer of the security which occurred after this event.

We need not, however, resolve either the legal or the factual issues. The parties with a stake in the controversy have agreed to an overall settlement, in lieu of battling it out over the merits. LBA has no stake in that controversy, because its equity interest in this Chapter 11 case is worthless. The parties who do have a stake in the controversy include: (a) the employee shareholders, who purport to have claims both against the Debtors and against benefit plan fiduciaries; (b) the Debtors; and, (c) those creditors whose distributions are diminished by the payments to Class 6C. Approval by this Court of that settlement, known in the Plan as the Employee ERISA/Compensation Claims Settlement, is a condition precedent to confirmation of the Plan. We are authorized by F.R.Bkrtcy.P. 9019 to approve the settlement and compromise of disputes, and will, shortly, take up this matter.

Second, LBA's argument overlooks the fact that, whatever the merits of their claims against the Debtors, the employee shareholders also have a variety of claims against employee benefit plan fiduciaries. Those claims, in turn, give rise to claims by the fiduciaries back against the Debtors for indemnification and contribution. The fiduciaries' claims, not within the purview of § 510(b), would have to be provided for in the Plan. The amount of any distributions to which the fiduciaries might be entitled would, absent the contemplated settlement, be resolved only after two rounds of extended litigation. Various groups of employees, each with varied legal and factual issues, would first proceed against the fiduciaries. Then, the fiduciaries would turn against the Debtors. We see no reason to prevent Plan proponents from satisfying the claims of Class 6C directly. Ultimately, those same claims probably would have to be satisfied indirectly, and, very likely, at greater cost to all involved.

Finally, LBA's argument for subordination quite clearly raises issues affecting the interests of other parties. LBA notes that the legislative purpose for enacting § 510(b) was to elevate the risks assumed by general creditors ahead of those assumed by equity security holders. It then argues:

> These considerations overwhelmingly favor subordination of the Employee Stock Claims. The Drexel employees who held DBL Group stock were conscious risk-takers, who, unlike general creditors, stood to profit if the company had prospered.... [C]reditors would have relied as much on the employee stock holdings as on other stock holdings to provide the "equity cushion" that underlies the allocation of risk between creditors and equity holders implicit in section 510(b).

Those general creditors whose interest LBA advances, however, were involved in negotiating a Plan that affords Class 6C claimants a distribution, and have voted overwhelmingly to approve that Plan. LBA asks us to undo what those with stakes in the matter have determined to be in their best interests.

Although we have considered and addressed LBA's § 510(b) argument, we hold in the alternative that LBA lacks standing to raise the matter. As Chief Judge Burton Lifland has observed:

> The doctrine of standing serves to protect the adversarial system which constitutes the cornerstone of American judicial process. Pursuant to this system, courts generally will only hear the arguments of parties who have a direct stake in the consequences of a proceeding. Thus a party who is not directly "aggrieved" by the construction of a provision of the Plan would lack the requisite standing.

*In re Johns–Manville Corp.*, 68 B.R. 618, 623–24 (Bkrtcy.S.D.N.Y.1986). (Emphasis in original).

## OBJECTION TO RELEASE AND INJUNCTION PROVISIONS

■ Driving LBA's objection to the release and injunction provisions is its belief that "the Plan and LBA's treatment under the Plan were products of a breach of fiduciary duty committed by the Equity Committee and its counsel."

The Equity Committee members are scheduled to receive a total of more than

$1,006,000 under the Employee Shareholder Settlement. The Equity Committee deliberately and vigorously pursued their stock-based claims in their own interest and on behalf of their colleagues, the other Employee Shareholders, to the detriment of LBA. Both the inequitable recovery garnered by the Employee Shareholders and the refusal to subordinate their claims to the level of common stock bear witness to the success of the Equity Committee's biased representation of the equity holders.

*Objection of Lambert Brussels Associates Limited Partnership to Confirmation of the Debtors' Joint Plan of Reorganization*, p. 6. We believe that, far from supporting its arguments against the release and injunction provisions, LBA's pique underscores the need for them. The Equity Committee successfully obtained value for LBA's valueless equity interest. LBA has no basis for complaining that the Committee also successfully negotiated different distributions for those with different interests.

 The release provision is, we believe, consistent with the role that committees play in the bankruptcy system, because it preserves liability of the Committee's members and its counsel for "willful misconduct." The Bankruptcy Code "contemplates a significant and central role for committees in the scheme of a business reorganization." *In re Penn–Dixie Industries, Inc.,* 9 B.R. 941, 944 (S.D.N.Y.1981). Official committees appointed under § 1102 are empowered under § 1103(c)(3) to

> participate in the formulation of a plan, [and] advise those represented by such committee of such committee's determinations as to any plan formulated....

While there is "implied in this grant of authority ... a fiduciary duty" to committee constituents, there is at the same time "an implicit grant of limited immunity." *In re Tucker Freight Lines, Inc.,* 62 B.R. 213, 216 (Bkrtcy.W.D.Mich.1986). The duty extends to the class as a whole, not to its individual members. In *Matter of Levy,* 54 B.R. 805, 807 (Bkrtcy.S.D.N.Y.1985), the Court ruled:

> Counsel for the ... committee do not represent any individual creditor's interest in [a] case; they were retained to represent the entire ... class. Therefore, counsel for the creditors' committee do not owe a duty to [one creditor] to maximize its interest at the expense of the remaining creditors in the represented class.

We believe that the same principle applies to the role of the individual members of the Equity Committee.

> The Bankruptcy Code confers a limited immunity upon those serving its ends, but it does not create any absolute immunity.

*In re Tucker, supra,* 62 B.R. at 218. The Plan's "willful misconduct" standard strikes the proper balance between breach of duty and limited immunity.

LBA's contention that the injunction provisions of the Plan will deny a remedy even for willful misconduct is simply untrue. Section 12.8.2 of the plan specifically provides that this Court will retain jurisdiction, among other things,

> c. to hear and determine all pending or future controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan ...
>
> m. to enforce all orders, judgments, injunctions and rulings entered in aid of confirmation and to facilitate consummation of the Plan....

Accordingly, we retain jurisdiction to permit a suit for willful misconduct to go forward, upon a proper showing after notice and hearing.

For the foregoing reasons, LBA's objections to confirmation of the Joint Plan of Reorganization, based upon § 510(b), and upon the release and injunction provisions, will be denied. Counsel for the Debtor shall settle an order consistent with the holdings of this Memorandum of Decision.