**In re WCI CABLE, INC., Worldnet Communications, Inc., Alaska Fiber Star, L.L.C., Alaska Northstar Communications, L.L.C., WCI Lightpoint, L.L.C., WCIC Hillsboro, L.L.C., Debtors–in–Possession.**

Nos. 301–38242–RLD11 to 301–38247–RLD11.

United States Bankruptcy Court, D. Oregon.

June 27, 2002.

Stephen A. McCartin, Dallas, TX, Jonathan E. Cohen, Portland, OR, for Debtors.

Kevin J. Leichter, Los Angeles, CA, Johnston A. Mitchell, Portland, OR, for Principal Objecting Party.

## MEMORANDUM OPINION *

RANDALL L. DUNN, Bankruptcy Judge.

After a highly contentious and relatively rapid process, the Third Amended and Restated Joint Plan of Reorganization (the "WCI Plan") of Debtors–in–Possession WCI Cable, Inc., WorldNet Communications, Inc., Alaska Fiber Star, L.L.C., Alaska Northstar Communications, L.L.C., WCI Lightpoint, L.L.C., and WCIC Hillsboro, L.L.C. (collectively, the "WCI Group"), along with the competing Plan of Reorganization (the "Notesan Plan") of Notesan Pty. Ltd. ("Notesan"), came on for confirmation at a four day hearing (the "Confirmation Hearing"), commencing on Tuesday, June 11, 2002. In advance of the Confirmation Hearing, I reviewed the objections to the WCI Plan and the Notesan Plan filed by various interested parties and the responses to objections filed by the WCI Group and Notesan. I also reviewed the proposed exhibits submitted by interested parties in advance of the Confirmation Hearing. I have reviewed carefully the authorities cited to me by the various interested parties and other authorities that I consider relevant. I listened closely and with interest to the testimony of witnesses presented at the Confirmation Hearing. I further have considered carefully and analyzed the arguments made by counsel for the various interested parties during the course and at the close of the Confirmation Hearing.

At the beginning of the last day of the Confirmation Hearing, Notesan withdrew the Notesan Plan from consideration for confirmation, leaving the WCI Plan as the only plan currently under consideration for confirmation in these cases.

In light of the foregoing preparations, review and analyses, I have reached a decision, and I am prepared to make my findings of fact and conclusions of law on confirmation issues. However, before I launch the discussion of standards and evidence relevant to my ultimate decision, some background information as to the WCI Group, Notesan and the history of these cases is necessary to provide context for the analysis of confirmation issues and evidence that follows.

*The WCI Group and Its History[1]*

The WCI Group of business entities was formed to develop, construct, own and op-

---

* Pursuant to Appendix "A" to the Order Confirming Debtors' Fourth Amended and Restated Joint Plan of Reorganization entered July 2, 2002, certain nonmaterial corrections were made to this Memorandum Opinion entered June 27, 2002. This document incorpo-

rates those changes. An amended Memorandum Opinion will not be entered.

1. Unless otherwise indicated, the description of the business and the historical background of the WCI Group, both before and after the WCI Group filed their chapter 11 bankruptcy petitions, included herein is taken from the

erate a fully integrated terrestrial and submarine fiber optic cable system from various points in Alaska undersea across the Gulf of Alaska to the Pacific Northwest, with connections to Portland and Seattle.

WorldNet Communications, Inc. ("WorldNet"), and WCI Cable, Inc. ("WCI"), were founded in 1996 and 1997, respectively, by Rodney T. Hudspeth ("Mr. Hudspeth"), an Australian entrepreneur affiliated with Notesan. Initially, Mr. Hudspeth obtained financing for the activities of the WCI Group from a number of sources. Ultimately, however, WCI Group financing was consolidated in the hands of AMP Life Ltd., a large Australian insurance company ("AMP"), in the form of equity and debt.

The corporate ownership structure of the WCI Group is split along two lines:

(a) WCI is owned approximately 90% by AMP and approximately 10% collectively by Notesan and Finowl Pty. Ltd. ("Finowl"), which like Notesan is affiliated with Mr. Hudspeth. WCI has three wholly-owned subsidiaries: Alaska Northstar Communications, L.L.C. ("Alaska Northstar"), WCI Lightpoint, L.L.C. ("Lightpoint"), and WCIC Hillsboro, L.L.C. ("Hillsboro").

(b) WorldNet likewise is owned approximately 90% by AMP and approximately 10% by Notesan and Finowl collectively. Alaska Fiber Star, L.L.C. ("Alaska Fiber Star"), is a wholly-owned subsidiary of WorldNet.

Mr. Hudspeth had a grand vision for the development of the WCI Group fiber optic cable network, and in the early years of AMP's connection with the WCI Group, AMP clearly bought into that vision. In fact, AMP advanced approximately $230,000,000 to develop and construct in-frastructure for the WCI Group fiber optic cable network and to support management for the enterprise under Mr. Hudspeth's leadership as CEO. *See* Notesan Exs. 53; 60; 67, p. 2; 84, p. 3.

As the telecommunications "boom" blossomed and peaked in the late 1990's, AMP apparently took comfort from the estimates of enterprise values that appeared to be building up and outstripping its commitments of funds to the closely held WCI Group. Although bitterly contested by AMP, there is some evidence to the effect that AMP made an open-ended commitment to finance the WCI Group, while agreeing that the equity interest of entities affiliated with Mr. Hudspeth in the WCI Group would never be diluted below 10%. *See* Notesan Ex. 8.

However, as the era of "irrational exuberance" waned, a number of factors combined to cause AMP to reevaluate its position regarding the WCI Group:

1. As stated in the Examiner's Report, WCI Ex. 22, p. 51: "By late 2000 and continuing through 2001 and into 2002, it became apparent that a vast oversupply of bandwidth had developed as too many companies had built too much capacity, a reflection of the poor estimation of demand and competition." Consequently, telecommunications companies like the WCI Group had built massive infrastructure with massive capital commitments and no prospects for positive cash flow. The capital markets repudiated the "new economics" strategy of growth before profits and were not willing to fund further substantial operating losses in the telecommunications industry. *Id.* In this deteriorating environment, there is evidence in the record that by late 2000, AMP had devalued its interest in the WCI Group from

WCI Group's Third Amended and Restated, Joint Disclosure Statement, approved for dissemination to creditors and interest holders on May 3, 2002.

$300,000,000 to $150,000,000, with further devaluations to come. *See* Notesan Exs. 36 and 62.

2. In 2000, AMP also replaced the team of Mark Jackson and Peter Cassidy, who primarily had overseen AMP's advances to the WCI Group, with Douglas Hogg and Roger Greville, who apparently were more hard nosed in their approach. *See* Notesan Ex. 53, WCI Ex. 22, p. 38. Mr. Hogg, in his interview with the Examiner, stated that he found the WCI Group's business plans and AMP's own paperwork concerning the WCI Group to be "horrific." WCI Ex. 22, p. 38.

3. AMP's representatives further lost confidence in Mr. Hudspeth as a manager. "They believed that Mr. Hudspeth was entrepreneurial, however, he lacked the focus and the ability to transform the company into an operating company. Moreover, he did not assemble either qualified employees or a qualified board who would be able to take the company into its next phase of operations." *Id.* at 24.

As a result of AMP's concerns for its deteriorating financial interest in the WCI Group and its lack of confidence in Mr. Hudspeth's ability to turn the situation around, AMP exerted its voting power on the Board of Directors of WCI to remove Mr. Hudspeth as CEO at a Board meeting on March 5, 2001, and ultimately to remove Mr. Hudspeth from the Board of Directors in May 2001. *See* Notesan Exs. 11F and 11H.

The WCI Group fared no better under the managers selected by AMP, and by the end of July, 2001, AMP refused to provide further financial advances to the WCI Group. At that point, the WCI Board of Directors sought out a nationally recognized workout specialist with experience in the telecommunications industry and hired Mr. Keith Maib ("Mr. Maib"), effective August 4, 2001. After evaluating the situation of the WCI Group with incumbent management, Mr. Maib recommended that the WCI Group seek protection under chapter 11 of the Bankruptcy Code. The respective Boards of Directors of WCI and WorldNet accepted his recommendation. All of the companies in the WCI Group filed for bankruptcy protection in chapter 11 on or about August 21, 2001.

*WCI Group Proceedings in Bankruptcy*

While these cases have been endlessly interesting, they never have been easy. The WCI Group chapter 11 cases have been consolidated for administrative purposes, but they have not been substantively consolidated. The WCI Plan does not call for substantive consolidation.

At an early point following the WCI Group's chapter 11 filings, on August 31, 2001, the court entered an Order approving the retention of PricewaterhouseCoopers, LLP ("PricewaterhouseCoopers") as financial advisors for the WCI Group.

A single creditors' committee (the "Creditors Committee") was appointed in the WCI case. Notesan was appointed to the Creditors Committee shortly after it was formed, on September 21, 2001, and served on the Creditors Committee until January 7, 2002, when Notesan left the Creditors Committee in recognition of its status as a potential purchaser of the WCI Group.

Because AMP claimed security interests in assets of the WCI Group, on September 17 and October 1, 2001, the WCI Group sought and obtained Orders from the court authorizing use of cash collateral through December 31, 2001. Under those Orders, the WCI Group preserved all rights to challenge the validity, extent and priority of AMP's claimed security interests. Use of cash collateral subsequently was extended through May 31, 2002, by a Stipulated Order between the WCI Group and AMP.

(A) *The WCI Group Strategy*

Throughout the early stages of these cases, the WCI Group and Mr. Maib took the position that due to severe liquidity problems and an inability of the WCI Group to obtain outside financing, moving rapidly, professionally and efficiently to a sale of the WCI Group's assets was the optimal strategy. Consistent with that strategy, Mr. Maib moved quickly to negotiate settlements of a number of substantial claims and took steps to clear title problems with WCI Group assets. In that regard, Mr. Maib negotiated and noticed for approval by the court settlements with AT & T, TyCom and various lien claimants with respect to the TyCom construction project. Mr. Maib also negotiated an arrangement with DeJon Corporation whereby it and its principal, Harold Dreyer, consented to allow the WCI Group assets to be sold free and clear of their claims, while preserving the substance of their claims for later determination.

Mr. Maib also sought and obtained the court's approval for a Bidding Procedures Order, entered on November 7, 2001, to organize the process for seeking and considering bids for the purchase of WCI Group assets in a sale pursuant to § 363 of the Bankruptcy Code.[2] Under the Bidding Procedures Order, December 7, 2001, was set as the deadline for receiving initial bids, and an auction for competition among qualified bidders was scheduled to commence on December 18, 2001.

In order to allow the WCI Group to focus their attention on the sale effort, Mr. Maib also sought and obtained an effective moratorium on formal discovery efforts with respect to claims until a data room could be set up by the WCI Group for document discovery. The data room was to be ready for review by interested parties by December 1, 2001.

(B) *The Position of Notesan and the Creditors Committee*

At least through December 2001, the Creditors Committee was aligned with Notesan in contending that the WCI Group had enough cash reserves not subject to any security interest in favor of AMP to fund an internal, stand-alone reorganization and ultimately pay creditors in full. Accordingly, the Creditors Committee opposed the WCI Group's Motion for a Bidding Procedures Order, and both the Creditors Committee and Notesan opposed the settlements with AT & T and TyCom, as selling long term capacity on the fiber optic cable network too cheaply in one case, and selling off valuable property rights to a competitor in the other. After substantial hearings, the court ultimately approved the AT & T and TyCom settlements as in the best interests of creditors. The Orders approving those settlements were not appealed.

(C) *The Auction Process*

An auction process took place over two days, starting on December 18, 2001. Out of that process, the WCI Group determined to propose for approval a sale of stock to Neptune Communications, LLC ("Neptune")[3] through a plan of reorganization, rather than pursue a § 363 sale of assets. The stock sale mechanism ostensibly would have allowed Neptune to take

---

**2.** Unless otherwise noted, all section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

**3.** The stock of the reorganized debtors is to be purchased by Crest Communications Corporation ("Crest"), a Delaware corporation and wholly owned subsidiary of Neptune. For convenience, "Neptune" collectively will refer to Neptune and Crest unless otherwise noted.

advantage of the substantial net operating loss carry-forwards held by the WCI Group, and thus increase the bid amount that Neptune would pay.

A competitive bidder, General Communications, Inc. ("GCI"), actually bid more than Neptune for the WCI Group assets. However, Mr. Maib, in consultation with various creditor constituencies, determined that the Neptune bid was more attractive because it represented a transaction that was more likely to close. A GCI transaction to acquire the assets of the WCI Group was perceived as presenting regulatory issues, primarily antitrust concerns, that could delay and possibly derail a closing. Mr. Maib asked GCI to waive regulatory approval as a condition to its acquisition of the WCI Group assets, but GCI would not accept the regulatory risk.

Following the auction process, at Neptune's request, the WCI Group sought the court's approval for a required incremental competing bid increase of $2.2 million, including a "topping fee" of $1.7 million payable to Neptune if it lost the ultimate bid. In light of Neptune's costs in establishing itself in the role of "stalking horse" for future competitive bids, and the relatively small percentage of the minimum overbid requirement in comparison to the overall amount of Neptune's bid, the court entered an Order approving the requested overbid protection and the $1.7 million topping fee. Notesan appealed that Order.

### (D) *Appointment of Examiner*

On January 4, 2002, the Creditors Committee filed a Motion for Order Directing Appointment of Examiner, seeking the appointment of an examiner to investigate and report on the WCI Group's claims and causes of action against AMP. On January 23, 2002, Notesan filed a motion joining in the Creditors Committee's request for the appointment of an examiner. Although the Creditors Committee ultimately withdrew its examiner motion, Notesan did not.

Following a hearing, the court entered an Order Directing Appointment of Examiner on February 1, 2002, directing the Examiner to investigate, analyze and evaluate the WCI Group's possible claims against AMP and to report on whether the settlement of WCI Group claims against AMP provided for in the WCI Group plan represented a reasonable possible settlement within the range of possible settlements that could be negotiated.[4] Later, the Examiner's charge was expanded to evaluate the settlement terms concerning the WCI Group's claims against AMP included in the WCI Plan and testify regarding his conclusions at the Confirmation Hearing. *See* WCI Ex. 29.

### (E) *Exclusivity and Competing Plans*

The WCI Group's exclusive period to file a chapter 11 plan under § 1121(b) initially was scheduled to terminate on or about December 18, 2001, and the WCI Group requested an extension of the exclusive period. The Creditors Committee and Notesan opposed any extension.

Based in large part on the progress that Mr. Maib had made in negotiating settlements with various substantial creditors and the momentum that had been built for a WCI Group plan, the court determined that an extension of the exclusive period would be in the best interests of creditors and entered an Order extending the exclu-

---

4. The Seattle law firm of Cairncross & Hempelmann, P.S. (the "Cairncross Firm") was appointed as the Examiner, with shareholder and director, John R. Rizzardi, primarily in charge of the Examiner project. The Cairncross Firm and Mr. Rizzardi will be referred to interchangeably herein as the "Examiner."

sive period to January 29, 2002. The WCI Group filed its first plan of reorganization within the extended deadline.

On February 26, 2002, a new player entered the scene: Chandalar Communications, LLC ("Chandalar") submitted an initial stock purchase proposal that offered $9.5 million more than the Neptune proposal around which the WCI Group plan was built. The WCI Group exhibited little enthusiasm for the Chandalar proposal, citing primarily regulatory concerns related to a business relationship between Chandalar and GCI that could jeopardize closing of a Chandalar transaction. Negotiations ensued between Chandalar and Mr. Maib, with input from various creditor constituencies. However, these negotiations neither resulted in the WCI Group embracing a Chandalar bid nor obtaining an increase in the bid from Neptune.

With Chandalar offering more money and apparently shut out of the plan process, and progress appearing to have stalled concerning resolution of the outstanding contentious claims, the court terminated exclusivity on April 8, 2002. At that time, it was clear that the WCI Group would be presenting a plan for confirmation. On April 19, 2002, Notesan and Chandalar each filed a competing plan with the court. Chandalar withdrew its plan on April 24, 2002, following GCI's termination of its business relationship with Chandalar.

Ultimately, the court approved disclosure materials and balloting for the WCI Plan and the Notesan Plan on May 3, 2002. Following the balloting, the WCI Plan and the Notesan Plan were presented for confirmation at the Confirmation Hearing, but the Notesan Plan was withdrawn on June 14, 2002, before the presentation of testimony in support of confirmation of the Notesan Plan.

### Jurisdiction

This court has jurisdiction over the matters presented for determination at the Confirmation Hearing pursuant to 28 U.S.C. § 1334(a), under which the federal district courts have original and exclusive jurisdiction over all cases under Title 11, and 28 U.S.C. § 157(a), authorizing the district courts to refer all Title 11 cases and proceedings to the bankruptcy judges for their respective districts. Local Rule 2100–1 of the United States District Court for the District of Oregon effectuates this reference. Plan confirmations are proceedings within the core jurisdiction of bankruptcy courts under 28 U.S.C. § 157(b)(2)(L). Approvals of settlements of bankruptcy estate claims are proceedings within the core jurisdiction of bankruptcy courts under 28 U.S.C. §§ 157(b)(2)(A), (C) and/or (O).

### Confirmation Standards

█ The requirements for confirmation of a plan of reorganization in chapter 11 are set forth in § 1129 of the Bankruptcy Code. The court has an affirmative duty to make sure that all of the requirements for confirmation under § 1129 have been met. *In re Ambanc La Mesa Ltd. Partnership,* 115 F.3d 650, 653 (9th Cir.1997). The court will confirm a plan if the plan proponent proves by a preponderance of the evidence either 1) that all 13 requirements of § 1129(a) have been met, or 2) if the only condition to confirmation that is not satisfied is § 1129(a)(8), that the plan satisfies the standards for "cramdown" under § 1129(b), *i.e.,* the plan "does not discriminate unfairly" against and is "fair and equitable" with regard to each impaired class that has not accepted the plan. *Id.*

### Ballot Summaries

Under § 1126(c), a class of creditor claims votes to accept a plan if at least two-thirds in amount and a majority in

number of class claimants who actually vote, cast votes in favor of the plan. In these cases, all impaired creditor classes in the WCI, Alaska Fiber Star, Alaska Northstar, Lightpoint and Hillsboro cases voted in favor of the WCI Plan.[5]

The classes of general nonpriority unsecured claims, other than the convenience classes, in the WCI, Alaska Fiber Star, Alaska Northstar, Lightpoint and Hillsboro cases voted as follows with respect to the WCI Plan:

| | # Accepting | # Rejecting | $ Amount Accepting | $ Amount Rejecting |
|---|---|---|---|---|
| WCI | 49 | 5 | $ 6,403,584.87 (94.7%) | $360,254.73 (5.3%) |
| Alaska Fiber Star | 20 | 2 | $ 948,440.22 (96.6%) | $ 33,053.56 (3.4%) |
| Alaska Northstar | 2 | 0 | $ 26,954,909.68 (100%) | $ 0 (0%) |
| Lightpoint | 2 | 0 | $ 3,363,497.83 (100%) | $ 0 (0%) |
| Hillsboro | 1 | 0 | $ 11,769.33 (100%) | $ 0 (0%) |

In the WorldNet case, two non-insider impaired classes, KeyBank and ultimately, DeJon Corporation, voted in favor of the WCI Plan. However, the class of general, nonpriority unsecured claims, including the claims of Notesan and its consultant, John Burns, rejected the WCI Plan by the following vote:

| | # Accepting | # Rejecting | $ Amount Accepting | $ Amount Rejecting |
|---|---|---|---|---|
| WorldNet | 1 | 3 | $ 13,285.73 (4.2%) | $300,733.80 (95.8%) |

Accordingly, assuming the WCI Plan satisfies the other requirements for confirmation of § 1129(a), the WCI Plan will have to meet the "cramdown" requirements of § 1129(b) with respect to the claims of general nonpriority unsecured claims in at least the WorldNet case.

### Uncontested Issues

At the Confirmation Hearing, no issues were raised as to the WCI Plan satisfying the requirements of §§ 1129(a)(2), (4), (5), (9), (10) and (12). Accordingly, I find, consistent with the testimony of Mr. Maib and the other evidence submitted in support of confirmation of the WCI Plan, that the requirements of §§ 1129(a)(2), (4), (5), (9), (10) and (12) have been met. In addition, it is not contested that the requirements of §§ 1129(a)(6) and (13) are inapplicable in these cases. Objections to confirmation of the WCI Plan and the testimony and argument presented at the

Confirmation Hearing focused on the other requirements of § 1129(a).

### Compliance with Applicable Provisions of the Bankruptcy Code

Under § 1129(a)(1), I must find that the WCI Plan complies with all applicable provisions of the Bankruptcy Code in order to confirm the plan. The objections of Notesan, DeJon Corporation and the United States Trustee, all of which have been adopted and joined by Notesan, focus on the release, exculpation, injunction and indemnification provisions of the WCI Plan. Since the concerned provisions raise a number of distinct issues, I discuss them and other § 1129(a)(1) issues separately, as follows.

### A. The AMP Releases and Injunction

■ Sections 15.5 and 15.6 of the WCI Plan provide that as of the effective date of

5. DeJon Corporation cast ballots voting to reject the WCI Plan in the WCI, Alaska Fiber Star and Lightpoint cases. However, during the course of the Confirmation Hearing, DeJon Corporation's claims against the WCI Group, AMP and Notesan were settled for $1.4 million, contingent upon the WCI Plan being confirmed and the settlement being approved by the court. As part of the agreed settlement, DeJon Corporation changed its votes from rejection to acceptance of the WCI Plan in the Alaska Fiber Star and Lightpoint cases and withdrew its contested vote in the WCI case.

the plan, each member of the WCI Group releases any and all claims (the "Released Claims") that it has against AMP and certain entities and individuals affiliated with AMP (collectively, the "AMP Releasees"), and a permanent injunction goes into effect prohibiting any party in interest in the WCI Group bankruptcy cases from pursuing the Released Claims against any of the AMP Releasees.[6]

The objections initially argue that Sections 15.5 and 15.6 of the WCI Plan provide for nondebtor releases and injunctions, which are impermissible under § 524(e) of the Bankruptcy Code.[7] They rely heavily on the decision of the Ninth Circuit in *In re Lowenschuss*, 67 F.3d 1394 (9th Cir.1995), which clearly holds that bankruptcy courts do not have the equitable power under § 105(a)[8] to discharge the liabilities of nondebtors through chapter 11 plan confirmation, contrary to the provisions of § 524(e). *Id.* at 1401–02.

▋ I agree that it is inappropriate to use § 105(a) substantively to effect results that are inconsistent with other provisions of the Bankruptcy Code. As stated by the Third Circuit in *In re Continental Airlines*, 203 F.3d 203, 211 (3d Cir.2000):

> "Section 105(a) of the Bankruptcy Code supplements courts' specifically enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code. However, section 105(a) has a limited scope. It does not 'create substantive rights that would otherwise be unavailable under the Bankruptcy Code.' *United States v. Pepperman*, 976 F.2d 123, 131 (3rd Cir.1992)."

*See also In re Digital Impact, Inc.*, 223 B.R. 1, 14 (Bankr.N.D.Okla.1998).

However, in these cases, the § 524(e) argument raised by the objections misses the point. The claims that the WCI Group

---

**6.** Sections 15.5 and 15.6 of the WCI Plan provide as follows:

15.5 Release Of AMP Releasees. On the Effective Date, each of the Debtors, their Estates and the Reorganized Debtors shall release and waive unconditionally, and shall be deemed to have settled, released and waived unconditionally, any and all claims, suits and/or Causes of Action of any kind and nature whatsoever that any of the Debtors, their Estates and the Reorganized Debtors has, had, held, holds, or might hold, assert or have asserted against any of the AMP Releasees including without limitation any possible claims, suits and/or Causes of Action (i) challenging the validity, perfection, extent and priority of the AMP Claims and Liens asserted by AMP; (ii) seeking equitable subordination of AMP Claims; (iii) seeking recharacterization of AMP Claims as equity interests; (iv) constituting and/or alleging lender liability, breach of fiduciary duty, conversion, breach of contract, tortious interference with contract or prospective contract or business relations, veil piercing, alter ego, fraud, constructive fraud and/or substantive consolidation claims, and (v) that the Debtors have alleged or might have alleged against any AMP Re-

leasee relating to or arising out of AMP's involvement with the Debtors up to and including the Effective Date.

15.6 Injunction. On and after the Effective Date, all holders of a Claim against or Interest in the Debtors, and all other parties in interest in the Bankruptcy Cases, shall be permanently enjoined from (a) asserting against any AMP Releasee, or (b) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against any AMP Releasee or property of any AMP Releasee, that would have the effect of asserting against any AMP Releasee or any AMP Releasee's property, any claim, liability or Cause of Action covered by Section 15.5 of this Plan.

**7.** Section 524(e) provides in relevant part that "... discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."

**8.** Section 105(a) provides: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title...."

propose to release in section 15.5 of the WCI Plan are solely WCI Group claims. They are assets of the WCI Group bankrupt estates. *See, e.g., In re Folks*, 211 B.R. 378, 384 (9th Cir. BAP 1997) ("Once the bankruptcy petition is filed property rights which belong to the debtor become assets of the estate. § 541(a)(1). Thus, a right of action which is property of the debtor becomes property of the estate."). No direct claims of third parties against any of the AMP Releasees are proposed to be released. The injunction provisions of section 15.6 enjoin interested parties only from pursuing claims of the WCI Group that are to be released pursuant to section 15.5. The pursuit of such parties' direct claims against any of the AMP Releasees is not enjoined.

### 1. *Releases and Injunctions as Provisions of Proposed Settlement*

I find that the release and injunction provisions of sections 15.5 and 15.6 of the WCI Plan are submitted for approval by the court pursuant to § 1123(b)(3)(A) and Fed.R.Bankr.P. 9019(a). Section 1123(b)(3)(A) specifically provides that a chapter 11 plan may provide for the settlement of any claim belonging to the debtor or to the estate.[9]

The proposed settlement with AMP and the AMP Releasees (the "AMP Settlement") was noticed for approval to all interested parties in the WCI Plan and in the accompanying disclosure statement.[10] To the extent that the authority of § 105(a) is invoked to approve the provisions of sections 15.5 and 15.6 of the WCI Plan, its use is limited to providing supplemental authority for the enforcement of a settlement that otherwise is subject to the court's approval under § 1123(b)(3)(A). Section 105(a) can be used with respect to the injunction provisions of the WCI Plan only to the extent necessary and appropriate to carry out the terms of an approved settlement. *See, e.g., In re Dow Corning Corp.*, 255 B.R. 445, 478 (E.D.Mich.2000); *In re Rohnert Park Auto Parts, Inc.*, 113 B.R. 610, 615 (9th Cir. BAP 1990) ("... section 105 permits the court to issue both preliminary and permanent injunctions after confirmation of a plan to protect the debtor and the administration of the bankruptcy estate").

### 2. *Standards for Approval of the Proposed Settlement*

■■■ Accordingly, the issue then becomes whether it is appropriate to approve the AMP Settlement. The standards for approval of a settlement of claims in bankruptcy are discussed at length in *In re A & C Properties*, 784 F.2d 1377, 1381–82 (9th Cir.1986). A debtor-in-possession has the burden of proof by a preponderance of the evidence to establish that a proposed settlement is reasonable, adequate, fair and equitable. "In determining the fairness, reasonableness and adequacy of a proposed settlement agreement, the court must consider: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises." *Id.* at 1381.

### 3. *The Proposed Settlement*

This is the point where Notesan's argument that this case is essentially all about

---

9. Section 1123(b)(3)(A) provides that "... a plan may ... provide for ... the settlement or adjustment of any claim or interest belonging to the debtor or to the estate...."

10. Fed.R.Bankr.P. 9019(a) provides that, "On motion by the [debtor-in-possession] and after notice and a hearing, the court may approve a compromise or settlement."

a shareholder dispute has the most resonance. AMP has asserted secured and unsecured claims in excess of $270,000,000 in the WCI Group bankruptcy cases. Notesan has objected to AMP's claims and disputes them bitterly. Under the WCI Plan, as proposed at the outset of the Confirmation Hearing, in exchange for the release and injunction provisions of sections 15.5 and 15.6, AMP is to be recognized as having two allowed nonpriority unsecured claims, a Primary AMP Settled Claim in the amount of $50.5 million and a Residual AMP Settled Claim in the amount of $179.95 million. AMP's allowed claims, in a total amount approximating its total alleged advances of principal to the WCI Group, would supersede AMP's filed claims in the WCI Group bankruptcies.

While the AMP claims allowed under the WCI Plan reflect a substantial discount from the claims filed by AMP, the most substantial consideration offered by AMP for the release and injunction provisions of the WCI Plan was AMP's agreement effectively to subordinate its right to receive any payment under the WCI Plan until other unsecured creditors, including Alcatel, had received total distributions of $30.8 million, estimated to represent a distribution of approximately 82.5 cents on the dollar. Thereafter, AMP was projected to receive distributions totaling approximately $40.548 million. *See* WCI Ex. 20. Accordingly, AMP was projected as never receiving any distribution on its Residual AMP Settled Claim. However, AMP would receive the right to a priority distribution of the first $5 million recovered from litigation of the WCI Group's claims against Notesan and affiliated entities, including Mr. Hudspeth (the "Designated Litigation Claims"), to be applied against the Residual AMP Settled Claim, and the Designated Litigation Claims cannot be settled without the prior written consent of AMP.

During the Confirmation Hearing, in light of events discussed at pp. 482–83 *infra*, AMP agreed to alter its treatment under the WCI Plan in two important respects: (1) AMP agreed to transfer up to $2 million of the distributions on its Primary AMP Settled Claim to general unsecured creditors other than Alcatel to meet the WCI Group's estimates of the amount required to achieve a 100% distribution to such creditors, plus up to $1 million to distribute to such creditors should their claims exceed the WCI Group's estimates; and (2) AMP agreed to transfer $700,000 of the distributions on its Primary AMP Settled Claim to DeJon Corporation to fund one half of the proposed DeJon Corporation settlement. Accordingly, under the WCI Plan, as so amended, payment of any amount to AMP on its allowed claims is effectively subordinated to a 100% distribution to general unsecured creditors other than Alcatel, which has agreed to a full settlement of its claim, based on an 82.5% distribution on its allowed claim. *See* discussion at pp. 474–75 *infra*.

### 4. *Application of the Standards for Approval to the Proposed Settlement*

The collectibility of any judgment or claim against AMP is uncontested. Accordingly, collectibility is not a material factor to be considered with respect to the proposed AMP Settlement.

### (a) *Mr. Maib's Analysis*

Mr. Maib testified at length at the Confirmation Hearing concerning his investigation of the WCI Group's potential claims against AMP. He testified that his investigation of those claims began almost immediately after his employment by the WCI Group. He testified that he had the WCI Group's legal counsel investigate potential

claims of the WCI Group against AMP, which encompassed possible claims in the following areas: (1) validity, extent and priority of security interests; (2) equitable subordination; (3) conversion of debt to equity; (4) breach of promise to convert debt to equity; (5) lender liability; and (6) breach of fiduciary duties, breach of promise(s) to fund, alter ego and piercing the corporate veil. He further testified that his investigation encompassed claims against AMP Henderson and Marcus Derwin.

He and his counsel reviewed thousands of documents and conducted number of interviews during the course of their investigations. *See* WCI Exs. 12, 13, 14, 15, 16 and 17. He also requested input from other interested parties in evaluating the WCI Group's potential claims against AMP. *See, e.g.,* WCI Ex. 18. He did not file litigation against AMP because he felt that initiating such litigation early in the WCI Group bankruptcy cases would be counterproductive. Accordingly, he did not initiate any formal discovery proceedings against AMP. However, he was careful to preserve the WCI Group's rights to challenge the extent, validity and priority of AMP's claimed security interests in WCI Group assets in the cash collateral orders entered early in the WCI Group cases.

Mr. Maib believes that one of his strengths is in evaluating significant claims quickly, and he determined early in the WCI Group bankruptcy process that negotiating a settlement with AMP would be vital to the best interests of creditors in order to preserve asset values in a deteriorating business environment. He further testified that he felt his investigation was adequate to reveal and analyze all material claims of the WCI Group against AMP.

Notesan challenges the adequacy of the investigations of the WCI Group's potential claims against AMP conducted by Mr. Maib and the WCI Group counsel because: (1) no formal discovery was conducted; (2) Mr. Maib and his counsel relied on voluntary productions of documents from AMP to gather relevant documents from AMP; and (3) Mr. Maib and WCI Group counsel only conducted a limited number of interviews of witnesses from the many witnesses who might have provided material information. *See, e.g.,* WCI Ex. 17, Tab 1, p. 1. Notesan also faults Mr. Maib for not adequately investigating potential claims against the individuals and entities affiliated with AMP included among the AMP Releasees. Ultimately, Notesan argues that Mr. Maib gave up immensely valuable claims against AMP and its affiliates in a settlement too early, based upon an inadequate investigation.

From his investigation, Mr. Maib considered the WCI Group's equitable subordination claims against AMP to be very strong, but not likely to result in summary judgment in the WCI Group's favor if litigation were initiated. He also concluded that AMP was not in a strong position to establish the validity of its alleged security interests in WCI Group assets. He did not perceive the WCI Group's cause of action for recharacterization of AMP's debt to equity as viable. *See, e.g., In re Pacific Express, Inc.,* 69 B.R. 112, 115 (9th Cir. BAP 1986). He further concluded that the WCI Group's other potential causes of action against AMP had a relatively low probability of success. Mr. Maib testified that he considers the WCI Group's potential claims against AMP to involve very complex causes of action, of uncertain potential outcome over an extended period if litigated to a conclusion.

Generally Mr. Maib's analysis is reflected in the amended version of the WCI Plan that is before me for confirmation: AMP is not recognized as having any se-

cured claim against assets of members of the WCI Group, and payment of AMP's claims is effectively subordinated to payment of the claims of other general nonpriority unsecured creditors. However, AMP is to have allowed unsecured claims in the approximate total amount of the principal of advances made by AMP to the WCI Group.

### (b) *The Examiner's Analysis*

As previously discussed at p. 465 *supra*, an Examiner was appointed on Notesan's motion in these cases to investigate, analyze and evaluate the WCI Group's potential claims against AMP and to determine if the settlement with AMP included in the WCI Plan represents a reasonable possible settlement in light of potential settlements that could be negotiated. In effect, the Examiner was appointed to provide a reality check on the adequacy of Mr. Maib's investigation of the WCI Group claims against AMP and to provide an independent evaluation of those claims in light of Notesan's spoken and unspoken criticisms of Mr. Maib to the effect that he was tainted by his employment by and association with a Board of WCI and a WCI Group management team that had among their numbers AMP employees on secondment.

The Examiner had a limited period to conduct his investigation, and thus, his investigation could not be exhaustive. However, he encouraged submissions from a large number of interested parties, many of whom responded. He and his partners reviewed thousands of documents. *See, e.g.*, WCI Ex. 17, WCI Ex. 22, pp. 68–112, and AMP Ex. 45. The Examiner heard presentations from a number of parties, including the WCI Group and its counsel, Notesan and its counsel, AMP and its counsel, counsel for the Creditors Committee, and DeJon Corporation. The Examiner conducted 38 witness interviews. *See* WCI Ex. 22, pp. 64–66. I find that the Examiner's Report was professionally, conscientiously and thoughtfully prepared.

Based upon his investigation, the Examiner concluded that it was highly likely that the WCI Group would prevail on its equitable subordination claims against AMP but did not agree with Notesan that the WCI Group was certain to prevail on those claims. *See* WCI Ex. 22, p. 16. The Examiner basically agreed with the WCI Group's conclusion that AMP's alleged security interests in assets of the WCI Group were not properly perfected. *Id.* at 19. The Examiner further agreed with the WCI Group that a cause of action to recharacterize the WCI Group's alleged debt to AMP to equity was not viable in the WCI Group bankruptcy cases. *Id.* at 15. The Examiner regarded the WCI Group's alter ego and piercing the corporate veil claims against AMP as generally weak. *Id.* at 29–32. In his report, the Examiner devoted substantial attention to the pros and cons of the WCI Group's lender liability claims against AMP and ultimately concluded that the WCI Group would be highly likely to prevail on such claims, but cautioned that the factual basis for such claims would be hotly contested. *Id.* at 33–45, 58. In his report, the Examiner further stated that he did not believe that AMP caused the filing by the WCI Group of their bankruptcy petitions or "that AMP dictated the hiring of" Mr. Maib. *Id.* at 58.

The Examiner concluded that summary judgment would not likely be granted in favor of the WCI Group on any of its claims against AMP. *Id.* He further concluded that the cost and complexity of litigating the WCI Group's claims against AMP would be "extremely high," and "the litigation would likely involve dozens of attorneys, numerous depositions of wit-

nesses who are located around the world, multiple expert witnesses and the production of tens of thousands, if not hundreds of thousands, of pages of documents." *Id.* at 59. The Examiner estimated that fighting such litigation through to a conclusion would take "at least two to four years," including appeals. *Id.* He also concluded that most of the creditors were in favor of the AMP Settlement. He determined that in evaluating the *A & C Properties* factors, the probability of success on the merits, considered in isolation, militated against the proposed settlement. However, when the costs, complexity and delays inherent in continued litigation, the wishes of unsecured creditors, with the exception of Notesan, and the deteriorating state of the telecommunications industry were added into consideration, his ultimate conclusion was that the proposed settlement with AMP was fair and equitable and in the best interests of creditors.

The Examiner testified at the Confirmation Hearing that in light of the changes to the WCI Plan made since his report was prepared, "the settlement and the result was practically unprecedented with regards to the return to unsecured creditors in a case of this nature," and "we support it." Tr., Vol. 3, p. 432. Although admitting under cross examination by Notesan's counsel that he had not focused on potential claims against affiliates of AMP included among the AMP Releasees in his investigation, he testified that no substantial information with regard to such causes of action had been presented to him during the course of his investigation that he could recall. He further testified that if such causes of action had been discussed during the course of that portion of Notesan's presentation from which he was absent, he would have heard about such causes of action from his partners if they had been identified.

### (c) *The Court's Analysis*

In light of the evidence presented by Mr. Maib and the Examiner in testimony, and further based upon the other evidence included in the record for the Confirmation Hearing, I find that the WCI Group likely would prevail on one or more causes of action against AMP if the WCI Group's claims against AMP were litigated to a conclusion. However, I bear in mind that even the WCI Group's arguably strongest cause of action, for equitable subordination, is based upon the application of equitable principles that might result in only a partial subordination of AMP's claims if the WCI Group prevails.

I find that the WCI Group's potential claims against AMP involve very complex causes of action that are unlikely to be resolved on summary judgment. I further find that monumental discovery within and outside of the United States would be required to prepare the WCI Group's causes of action against AMP for trial. I also am aware from the highly contentious proceedings in these cases to date, that pretrial proceedings among the WCI Group, AMP and Notesan would be both vigorously contested and wearyingly protracted. The Examiner noted that the parties appeared to be extremely contentious, and virtually every witness he interviewed appeared to be biased toward one side or the other. I further note that these parties play for keeps and do not give quarter. I agree with the Examiner and find that litigating the WCI Group claims against AMP through trial and the inevitable appeal(s) would take years.

The ballot summaries discussed at pp. 466–67 *supra* reflect that unsecured creditors have voted overwhelmingly for the WCI Plan, including the AMP Settlement, even before AMP agreed to transfer its rights to distributions so that general

unsecured creditors other than Alcatel would receive an estimated 100% of their allowed claims before AMP received any distribution. During the final arguments at the Confirmation Hearing, Notesan stood alone in opposing confirmation of the amended WCI Plan.

The WCI Plan effectively subordinates any payment to AMP to estimated 100% distributions to unsecured creditors, while allowing Notesan to retain and litigate its direct claims against AMP. If I do not approve the AMP Settlement, creditors are potentially left with the prospect of sitting back helplessly, hoping that the jackpot is hit, while the WCI Group assets face an uncertain future in a deteriorating environment. In these circumstances, I find that Mr. Maib proposed the AMP Settlement in the WCI Plan in a reasonable exercise of his business judgment, that the consideration provided by AMP under the AMP Settlement is adequate, and that the AMP Settlement is fair and equitable. Accordingly, I am prepared to approve the AMP Settlement as consistent with the requirements of the Bankruptcy Code.

### B. *The Alcatel Settlement*

■ Section 2.4 of the WCI Plan provides that as of the effective date of the plan, each member of the WCI Group shall release any and all claims against Alcatel, and Alcatel shall have an allowed nonpriority general unsecured claim in the amount of $26.183 million that will receive an estimated 82.5 cents on the dollar distribution under the WCI Plan. In addition, Alcatel and AMP will release one another and their respective affiliates from claims in any way relating to the WCI Group and their respective businesses. The proposed Alcatel settlement was noticed for approval pursuant to § 1123(b)(3)(A) and Fed.

R.Bankr.P. 9019(a) to all interested parties in the WCI Plan and disclosure statement.

Mr. Maib explained during the course of his testimony that Alcatel had worked on the Alaska Northstar cable system, and the original unpaid obligation to Alcatel was $25 million, which had increased to the claim amount to be allowed through the accrual of interest. In Mr. Maib's view, based on the advice of counsel, any disputes between Alcatel and Alaska Northstar under the original Engineering and Procurement Agreement between them, dated December 5, 1997 (the "EPC Agreement"), had been effectively waived through the provisions of Section 9.15 of the Deferred Payment Agreement between Alcatel and Alaska Northstar, dated May 12, 1999 (the "Deferred Payment Agreement").

Section 9.15 of the Deferred Payment Agreement provides as follows: "*Absolute Obligation.* [Alaska Northstar] agrees that its obligation to make all of the payments under this Agreement are absolute and unconditional and are not subject to any deduction, counterclaim, defense or set-off of any kind or nature against any amounts that might be owed from time to time to [Alaska Northstar] by (I) [Alcatel], or (ii) or any other Person." *See* WCI Ex. 26, pp. 27–28.

Accordingly, in negotiating with Alcatel, Mr. Maib felt that he had little in the way of substantive defenses to the Alcatel claim, based upon the lack of any substantial commercial activity between the WCI Group and Alcatel subsequent to the parties entering into the Deferred Payment Agreement. He negotiated the best discount that he could get from full payment of the Alcatel claim. He further testified that his negotiation of the proposed settlement with Alcatel paved the way for securing the support of other unsecured creditors for the 82.5 cents on the dollar

estimated distribution under the WCI Plan as proposed prior to the Confirmation Hearing. Alcatel stands by its acceptance of the 82.5% estimated distribution under the WCI Plan and will not benefit from the transfer of distributions from AMP that will allow other general nonpriority unsecured creditors to receive an estimated 100% distribution on their allowed claims.

The settlement provisions between Alcatel and AMP concern primarily Alcatel's claim that AMP provided a written guarantee of payment of Alcatel's claims against Alaska Northstar. AMP contends that any such promise of payment, to the extent it exists, relates to Alaska Northstar's obligations under the EPC Agreement and has no application to the Deferred Payment Agreement that effectively superseded the EPC Agreement.

On cross-examination, Notesan attempted to make the points through Mr. Maib that Section 9.15 of the Deferred Payment Agreement is not worded conventionally as a release of claims, and that Alaska Northstar may have substantial unresolved claims against Alcatel that would not be preserved through the proposed settlement. Counsel for Alcatel countered that the disclosure materials for the Notesan Plan contained no description of any such extant claims against Alcatel. In addition, I note that the Deferred Payment Agreement was entered into during Mr. Hudspeth's tenure as CEO of the WCI Group. Mr. Hudspeth was present in the courtroom during Mr. Maib's testimony with respect to the proposed settlement with Alcatel. However, Notesan did not call Mr. Hudspeth as a witness in support of its objections to the WCI Plan to present any interpretation of Section 9.15 of the Deferred Payment Agreement that differed from Mr. Maib's.

Based upon the evidence presented, I find Mr. Maib's interpretation of Section 9.15 of the Deferred Payment Agreement and its impact to be reasonable. I further find that the proposed settlement with Alcatel set forth in Section 2.4 of the WCI Plan reflects the best deal that could be negotiated by the WCI Group with Alcatel under the circumstances of these cases and reflects the exercise of reasonable business judgment by Mr. Maib. I further find that the consideration received by the WCI Group in terms of the discounted settlement distribution to Alcatel is adequate, and I find that the proposed settlement with Alcatel is fair and equitable and is in the best interests of creditors and the WCI Group estates.

### C. Settlement of Intercompany Claims

Section 2.5 of the WCI Plan provides that as of the effective date of the plan, all claims between and among the various members of the WCI Group shall be deemed set off against one another, and WCI shall receive new membership interests in its limited liability company affiliates in the WCI Group (Alaska Fiber Star, Alaska Northstar, Lightpoint and Hillsboro), as provided for in Section 5.11 of the WCI Plan. The proposed settlement of intercompany claims (the "Intercompany Settlement") was noticed to all interested parties for approval by the court pursuant to § 1123(b)(3)(A) and Fed.R.Bankr.P. 9019(a) in the WCI Plan and disclosure statement.

Mr. Maib testified that he had investigated the various intercompany claims among the WCI Group and determined that they were poorly and incompletely documented in the records of the WCI Group. In light of the difficulties in accurately reconstructing and appropriately documenting the intercompany transactions among members of the WCI Group,

particularly in light of personnel changes that limited institutional memory, Mr. Maib testified that the effort required to sort out intercompany transactions fully would not be cost effective. *See also* WCI Ex. 9. Accordingly, he proposed the Intercompany Settlement in the exercise of his business judgment, as in the best interests of creditors.

His recommendation of the Intercompany Settlement was not challenged during the course of the Confirmation Hearing and was not opposed in any of the filed objections to the WCI Plan. Accordingly, based on the evidence before me, I find that the proposed Intercompany Settlement incorporated in the WCI Plan is fair and equitable and in the best interests of creditors and other interested parties.

### D. *The Creditors Committee Exculpation*

■ Section 11.3 of the WCI Plan (the "Creditors Committee Exculpation Clause") limits the liability of Creditors Committee members and their agents, other than Notesan and its officers, directors, employees and agents, for any of their actions or omissions to act with respect to the WCI Group bankruptcy proceedings, except for willful misconduct or *ultra vires* acts.[11] During final argument at the Confirmation Hearing, counsel for the Creditors Committee confirmed that the limitation of liability provided for in the Creditors Committee Exculpation Clause did not extend to Creditors Committee professionals, including Creditors Committee counsel.

The United States Trustee objected to the Creditors Committee Exculpation Clause as a gratuitous provision that should be rejected to the extent that it could be interpreted as enhancing liability protections for members of the Creditors Committee beyond the immunity for official acts of creditors' committees implicit in § 1103(c).[12]

I am persuaded by the reasoning of the Third Circuit in *In re PWS Holding Corp.*, 228 F.3d 224, 245–47 (3d Cir.2000), that the Creditors Committee Exculpation Clause does not provide a prohibited release of nondebtor liability, but in fact does no more than state clearly the appropriate standard for immunity of Creditors Committee members in performing their functions under § 1103(c). Accordingly, I find that the Creditors Committee Exculpation

---

11. Section 11.3 of the WCI Plan specifically provides as follows: "Exculpation of Creditors' Committee and its Agents. Neither the Creditors' Committee nor any of its past or present members (other than Notesan) nor any of their respective past or present officers, directors, employees, or agents during the Bankruptcy Cases (other than Notesan and its officers, directors, employees and agents), shall have or incur any liability to any holder of a Claim or Interest or to any other Entity for any act or omission in connection with, or arising out of, the Bankruptcy Cases, negotiation and pursuit of confirmation of this Plan or the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan except for willful misconduct or *ultra vires* acts."

12. Section 1103(c) provides: "A committee appointed under section 1102 of this title may 1) consult with the trustee or debtor in possession concerning the administration of the case; 2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan; 3) participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated, and collect and file with the court acceptances or rejections of a plan; 4) request the appointment of a trustee or examiner under section 1104 of this title; and 5) perform such other services as are in the interest of those represented."

Clause is outside of the scope of § 524(e). Also *see, e.g., Vasconi & Assoc., Inc. v. Credit Manager Ass'n of California,* 1997 WL 383170 (N.D.Cal. July 1, 1997); and *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 717, 722 (Bankr.S.D.N.Y.1992).

I am mindful of the United States Trustee's concern that a restatement of statutory immunity in a chapter 11 plan is subject to abuse in terms of expanding limitations of liability beyond any immunity provided for in the Bankruptcy Code. However, I also am sensitive to the concerns expressed by counsel for the Creditors Committee at the final argument that the terms of the Creditors Committee members' liability limitations be clearly and expressly stated in light of the contentious nature of proceedings in these bankruptcy cases. *See, e.g., In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. at 722 ("We believe that far from supporting its arguments against the release and injunction provisions, LBA's pique underscores the need for them.").

I find that the limitation of liability provisions for Creditors Committee members and their agents, other than professionals, included in the Creditors Committee Exculpation Clause cover no more and no less

than the limited immunity for creditors' committee members performing their functions under the Bankruptcy Code contemplated in § 1103(c). Accordingly, I find that the Creditors Committee Exculpation Clause complies with, and is not inconsistent with, applicable provisions of the Bankruptcy Code.

E. *Exculpation and Injunction Provisions Concerning the WCI Group and the WCI Trust*

Section 15.2 of the WCI Plan (the "WCI Group Exculpation Clause") essentially limits the liability of the WCI Group, the Trustee and Board of Directors of the WCI Trust to be formed pursuant to the WCI Plan, and their respective officers, directors, employees and agents, including professionals, for any of their actions or omissions to act with respect to the WCI Group bankruptcy proceedings, except for willful misconduct or gross negligence.[13] At the Confirmation Hearing, counsel for the WCI Group stated that Section 15.2 of the WCI Plan would be amended to clarify that its provisions relate only to postpetition acts of the subject persons and entities. Section 15.4 of the WCI Plan (the "WCI Group Injunction") essentially pro-

---

**13.** Section 15.2 of the WCI Plan provides as follows: "Exculpation of the Debtors, the Reorganized Debtors, the Trustee, the WCIC [sic]. Trust Board and Their Respective Agents. None of the Debtors, the Reorganized Debtors, the Trustee, and the WCI Trust Board, nor any of their respective officers, members, directors, employees, representatives, attorneys, accountants, financial advisors, or agents who were or in the future are officers, members, directors, employees, representatives, attorneys, accountants, financial advisors, or agents, as the case may be, during the Bankruptcy Cases or while this Plan is being administered shall have or incur any liability to any holder of a Claim or Interest, or to any other Entity for any actor omission in connection with, or arising out of the Bankruptcy Cases, the pursuit of confirmation

of the Plan, the consummation of the Plan, or the administration of the Plan, or the property to be distributed under the Plan including, without limitation, failure to obtain confirmation of the Plan or to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the occurrence of the Effective Date, except for willful misconduct or gross negligence, and, in all respects, the Debtors, the Reorganized Debtors, the Trustee and the WCI Trust Board and each of their respective members, officers, directors, employees and agents shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided, however, that the foregoing shall not supersede the 'safe harbor' from liability provided by Section 1125(e) of the Bankruptcy Code."

vides for an injunction against acts of persons or entities holding claims and/or equity interests with respect to the WCI Group from pursuing claims against the WCI Group, the WCI Trust or their successors in interest except as consistent with provisions of the WCI Plan.[14]

### 1. *Exculpation Provisions*

■ These related but distinct provisions of the WCI Plan raise issues beyond the simple restatement of statutory immunity provided by the Creditors Committee Exculpation Clause, discussed at pp. 476–77 *supra*. The WCI Group Exculpation Clause is particularly problematic because it establishes one standard of liability for postpetition conduct, limited to willful misconduct and gross negligence, for the WCI Group entities and their officers and agents, fiduciaries of the WCI Trust, and their professionals. Different liability standards may be appropriate and/or ap-

plicable under the Bankruptcy Code to these different entities and individuals in various circumstances in performing their respective functions postpetition in bankruptcy, and the lines separating actions protected by immunity from actionable conduct are neither clearly nor easily drawn. *See, e.g., In re Castillo*, 248 B.R. 153, 157 (9th Cir. BAP 2000) ("The courts use a functional approach to determine whether a nonjudicial officer is entitled to absolute quasi-judicial immunity, looking to the nature of the function performed and not the identity of the actor performing it."); and *In re Kashani*, 190 B.R. 875, 883 (9th Cir. BAP 1995) ("While a trustee is allowed to make reasonable mistakes where discretion is allowed, a trustee may be sued for intentional or negligent actions which amount to violations of the duties imposed upon the trustee by law.").

**14.** Section 15.4 of the WCI Plan provides as follows: "Injunction. Except as otherwise provided in the Plan, upon entry of the Confirmation Order, all Entities that have held, hold or may hold Claims against or Interests in the Debtors are, with respect to any such Claims or Interests, permanently enjoined from and after the Confirmation Date from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, or the WCI Trust, any of their respective property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, the Debtors, or any property of any such transferee or successor; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Reorganized Debtors or the WCI Trust, any of their respective property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, the

Debtors, or any property of any such transferee or successor; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors or the WCI Trust, any of their respective property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Entities; (d) asserting any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due the Debtors, the Reorganized Debtors or the WCI Trust, any of their respective property, or any direct or indirect transferee of any property of, or successor in interest to, the Debtors; (e) exercising any provision contained in any contract, lease or instrument which was entered into by any of the Debtors prior to the Petition Date and which is not cancelled or rejected under this Plan that allows a Creditor to declare, or that declares, a default based on the commencement of the Bankruptcy Cases, the insolvency or financial condition of the Debtors or the subjective insecurity of such Creditor; and (f) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan."

The decisions in this area have arrived at varied and often inconsistent results. However, in general, decisions in the Ninth Circuit appear not to favor exculpation or indemnification provisions that limit liability for negligence or breaches of fiduciary duties. *Compare, e.g., In re PWS Holding Corp.,* 228 F.3d at 245–47 (The Third Circuit upheld a limitation of liability clause similar to the WCI Group Exculpation Clause, limiting liability of the debtors, the reorganized debtors, the creditors' committee and their respective officers, directors, employees, and agents, among others, to liability arising with respect to the subject chapter 11 cases as a result of willful misconduct or gross negligence.); and *In re Halpern,* 248 B.R. 43 (Bankr. S.D.N.Y.2000) (The court approved an investment advisor contract that provided for indemnification of the investment advisor for its own acts of negligence.) *with In re Cochise College Park, Inc.,* 703 F.2d 1339, 1357 (9th Cir.1983) ("Although a trustee is not liable in any manner for mistakes in judgment where discretion is allowed, ... he is subject to personal liability for not only intentional but also negligent violations of duties imposed upon him by law...."); *In re Metricom, Inc.,* 275 B.R. 364 (Bankr.N.D.Cal.2002) (Broad indemnification and exculpation provision of financial advisor agreement not approved, based on no showing of reasonableness, but such provisions not invalid *per se.*); *In re Mortgage & Realty Trust,* 123 B.R. 626 (Bankr.C.D.Cal.1991) (Provisions of investment advisor agreement not approved providing for indemnification extending only to acts other than negligence, gross negligence or willful misconduct.); and *In re Allegheny Intern., Inc.,* 100 B.R. 244, 246–47 (Bankr.W.D.Pa.1989) (The

court required financial advisor indemnification provisions to exclude negligence in addition to gross negligence and willful misconduct. "... [I]ndemnification for negligence may be acceptable in 'the workaday world for those acting at arm's length.' However, holding a fiduciary harmless for its own negligence is shockingly inconsistent with the strict standard of conduct for fiduciaries.").

■ Indemnification and exculpation clauses can be included in chapter 11 plans as the products of negotiation among interested parties. However, in these cases, Notesan and the United States Trustee clearly have not consented to approval of the WCI Group Exculpation Clause in the WCI Plan.

■ Prospective unavailability of insurance coverage may provide basis for determining exculpation or indemnification provisions to be reasonable in a particular case. However, in these cases, as in *In re Metricom, Inc.,* 275 B.R. at 371–72, no evidence was presented that insurance "is either unavailable or prohibitively expensive."

On the other hand, as I found with respect to the Creditors Committee Exculpation Clause, I find that the WCI Group and their officers and agents have a legitimate concern in these bitterly contested cases with the potential for claims being asserted against them regarding their postpetition acts.

Accordingly, I am prepared to approve the WCI Group Exculpation Clause as complying with applicable provisions of the Bankruptcy Code for purposes of § 1129(a)(1) [15], *but only* if the exculpation exceptions are extended to cover negli-

---

**15.** I agree with Judge Brown's conclusions in *In re Great Western Chemical Co.,* Case No. 301–36610–tmb11 (Oral Ruling on May 3, 2002), that §§ 1129(a) and (5) are not the appropriate standards for consideration of exculpation and indemnification provisions as provided for in the WCI Group Exculpation Clause.

gence and breaches of fiduciary duty as well as gross negligence and willful misconduct, both in the WCI Group Exculpation Clause itself and in the analogous provisions of the WCI Group Liquidating Trust Agreement, as cited by the United States Trustee. I further find that the WCI Group Exculpation Clause is a severable provision from the WCI Plan.

### 2. *Injunction Provision*

█ The WCI Group Injunction presents less thorny issues. Both Notesan and the United States Trustee object to this provision. Notesan's objection focuses on the breadth of the WCI Group Injunction, arguing that it may prevent Notesan from pursuing its direct claims against AMP. However, I interpret the WCI Group Injunction as doing nothing more than enjoining parties from pursuing claims or interests of the WCI Group that are discharged upon confirmation of the WCI Plan, consistent with the discharge provisions of the WCI Plan contained in Section 15.1, to which no party has objected.

Section 15.1 of the WCI Plan is consistent with the effects of discharge provisions of § 1141(c). Accordingly, the court has authority under § 105(a) to approve the WCI Group Injunction to the extent necessary and appropriate to enforce the provisions of § 1141(c) and the consistent provisions of Section 15.1 of the WCI Plan. I find that the WCI Group Injunction is not inconsistent with the provisions of § 524(e) and that the United States Trustee's concerns expressed in that regard are groundless. Accordingly, I find that the WCI Group Injunction is consistent with the provisions of the Bankruptcy Code.

### F. *Alaska Railroad Corporation*

█ WorldNet and Alaska Fiber Star are parties to a number of permits/leases (the "Permits") with the Alaska Railroad Corporation. Since the Permits, among other things, encompass the rights of way in which the WCI Group's fiber optic cable is laid between Anchorage and Eielsor Air Force Base and between Anchorage and Whittier in Alaska, the WCI Group wishes to assume the Permits under the WCI Plan.

The WCI Group and the Alaska Railroad Corporation are in litigation (the "Adversary Proceeding") pending before the United States District Court for the District of Oregon, in which the WCI Group is seeking in effect to obtain rate relief under the Permits. Since jurisdiction over the Adversary Proceeding and the issues relating to the WCI Group's claims in the Adversary Proceeding have been divested from this court, I am in no position to make any determinations with respect to WCI's claims in the Adversary Proceeding. What the WCI Group would like me to do in confirming the WCI Plan is to allow the WCI Group to assume the Permits while holding in abeyance the WCI Group's obligation to make any cure payments to the Alaska Railroad Corporation under the Permits until the Adversary Proceeding is decided.

The Alaska Railroad Corporation is a sovereign entity of the state of Alaska. However, the Alaska Railroad Corporation has clearly and unequivocally waived any defense based on sovereign immunity to allow me to hear and decide its objection to the WCI Plan.

The WCI Group and the Alaska Railroad Corporation are agreed as to the amounts that would be required to cure the WCI Group's payment defaults under the Permits, under their current provisions. *See* Alaska Railroad Corporation Ex. 1. However, the Alaska Railroad Corporation objects to the WCI Group's proposal to hold cure payments in abeyance until the Adversary Proceeding is decided,

as contrary to the requirements of § 365(b).

Section 365(b)(1)(A) provides that "[i]f there has been a default in an executory contract or unexpired lease of the debtor, the [debtor-in-possession] may not assume such contract or lease unless, at the time of assumption of such contract or lease, the [debtor-in-possession] cures, or provides adequate assurance that the [debtor-in-possession] will promptly cure, such default...."

Under the WCI Plan, Neptune has agreed to assume the obligation to pay any amounts owing to the Alaska Railroad Corporation under the Permits. The WCI Trust, which will make distributions to the WCI Group's creditors with respect to their allowed claims, will have no obligation to make any required cure payments to the Alaska Railroad Corporation.

The WCI Group wants the benefits of assumption of the Permits without having to make any cure payments currently. Such an assumption of benefits without burdens is not appropriate under § 365(b)(1)(A). *See, e.g., City of Covington v. Covington Landing Ltd. Partnership,* 71 F.3d 1221, 1226 (6th Cir.1995) ("When the debtor assumes the lease or the contract under § 365, it must assume both the benefits and burdens of the contract. Neither the debtor nor the bankruptcy court may excise material obligations owing to the non-debtor contracting party."); and *United States v. Gerth,* 991 F.2d 1428, 1432–33 (8th Cir. 1993) ("... [W]hen assuming a contract, the debtor assumes all the benefits and burdens of the contract.").

Accordingly, I find that § 365(b)(1)(A) requires that the cure payments, as currently required under the Permits and as set forth on Alaska Railroad Corporation Ex. 1, must be paid consistent with the provisions of Section 12.2 of the WCI Plan for cure of executory contracts and unexpired leases generally, without waiting for a determination of the Adversary Proceeding. However, I further find that payment of the required cure amounts may be made with reservation of any reimbursement, refund and/or setoff rights that may be found to be appropriate in the Adversary Proceeding or in any other appropriate proceeding initiated by the parties.

### G. *Conclusion*

In light of the foregoing specific findings, I find that, contingent on the WCI Group amending the WCI Plan: (1) to add negligence and breach of fiduciary duties to the exceptions from exculpation in the WCI Group Exculpation Clause and in the analogous provisions for exculpation and/or indemnification in the WCI Liquidating Trust Agreement; and (2) to provide for prompt cure of the amounts currently in default under the Permits to the Alaska Railroad Corporation, without waiting for a decision in the Adversary Proceeding, the WCI Plan complies with all applicable provisions under the Bankruptcy Code, as required under § 1129(a)(1). Based upon these findings, I will deny Notesan's "Motion For Partial Judgment Pursuant to Federal Rule 52(c)" ("Motion for Partial Judgement"), filed at the commencement of the Confirmation Hearing. I note that in substance, the Motion for Partial Judgment was a further (and untimely) objection to confirmation.

### Good Faith

Under § 1129(a)(3), in order to confirm the WCI Plan, I must find that the plan has been proposed in good faith and not by any means forbidden by law. Two concepts of "good faith" are in circulation in these cases, and it is important to distinguish them in coming to a decision on whether the WCI Plan was proposed in good faith.

## A. Good Faith in Filing

A subtext of Notesan's opposition to the conduct of proceedings in these cases by the WCI Group and their representatives is its position that AMP in effect engineered the WCI Group's bankruptcy filings to protect AMP's interests in the WCI Group at the expense of Notesan and, ultimately, to eliminate Notesan's equity interest in the WCI Group. The WCI Group and AMP strongly disagree with Notesan's position.

 Such argument is more appropriate to a motion to dismiss a chapter 11 case pursuant to § 1112(b) for cause. It is not dispositive under § 1129(a)(3), because good faith determinations in the context of confirmation are made based on consideration of the totality of the circumstances, with a distinct focus on the provisions of the plan. "Thus, for purposes of determining good faith under section 1129(a)(3) ... the important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." In Re Madison Hotel Assoc., 749 F.2d 410, 425 (7th Cir.1984).

At the Confirmation Hearing, no evidence was presented to establish that AMP inappropriately influenced the decision to cause the members of the WCI Group to file for protection under chapter 11 of the Bankruptcy Code. Mr. Maib testified that prior to his employment by the WCI Group, he had no prior connection with AMP, and he did not know Mr. Chehi, AMP's principal counsel in these cases. Mr. Maib further testified that his recommendation to the WCI Board for the WCI Group to file petitions in bankruptcy was based on his own investigation of the situation confronting the WCI Group in August 2001, and the Board decision to accept his recommendation was unanimous. I find that Mr. Maib's testimony on this matter

was credible. Also, as noted at p. 472 supra, the Examiner stated in his report, following the conclusion of his investigation, that he did not believe that AMP caused the WCI Group to file their chapter 11 petitions of that AMP had anything to do with the hiring of Mr. Maib.

If AMP expected that chapter 11 would do wonders for its investment in the WCI Group, I note that the WCI Plan currently provides the following treatment for AMP: AMP will retain no ownership interest in the WCI Group and is recognized as having no secured claims against assets of the WCI Group. General nonpriority unsecured creditors, with the exception of Alcatel, will be paid the WCI Group's estimate of 100% of their allowed claims before AMP receives a dime under the WCI Plan, and Notesan retains its direct claims for litigation against AMP. AMP's projected distribution under the WCI Plan, as amended, amounts to approximately 16% of the principal amount of its advances to the WCI Group. See WCI Ex. 20.

## B. Good Faith for Plan Confirmation Purposes

 The principal challenge to the WCI Group's good faith in proposing the WCI Plan focused on a revelation on the second day of the Confirmation Hearing. Approximately two weeks before the Confirmation Hearing, at his deposition taken by counsel for Notesan, Mr. Maib revealed that a business relationship existed between Neptune and Alaska Communications Systems ("ACS"), a substantial competitor of GCI in the Alaska marketplace. At his deposition, Mr. Maib further stated that the existence of that relationship might be covered by a confidentiality agreement. Keith Maib Deposition, May 29, 2002, Vol. 2, pp. 147 and 157.

Only on the second day of the Confirmation Hearing did the court and counsel for Notesan get an opportunity to review the confidential business agreements between Neptune and ACS. Their Memorandum of Understanding, Notesan Ex. 81 (the "Memorandum of Understanding"), provides that ACS would provide a $15 million dollar loan to Neptune, substantially contemporaneously with confirmation of the WCI Plan. As consideration, ACS would receive a three-year option to purchase substantially all of the Alaska land based facilities of the WCI Group (the "Alaska Assets"). The option could be exercised by ACS cancelling the unpaid balance of the $15 million loan, plus accrued interest, with closing of the option purchase to occur upon ACS receiving appropriate regulatory approval for its acquisition of the Alaska Assets. In addition, under the Memorandum of Understanding, Neptune agreed that ACS' consent would be required with respect to pricing of certain long-term capacity transactions, and all revenues from such transactions would be reserved for the benefit of ACS during the option period or used to pay down the Neptune debt to ACS.

Following the revelation of the terms of the Neptune/ACS business deal, in testimony closed to all parties other than the WCI Group, Notesan, Neptune, ACS and counsel for the Creditors Committee, the court ended testimony for the day. After meeting with counsel for the WCI Group, Notesan and the Creditors Committee in chambers, the court suggested in open court that now would be a good time for the various interested parties to take stock of their respective positions and see if resolutions of their outstanding issues could be negotiated.

When the Confirmation Hearing resumed the following day, the WCI Group's counsel reported no progress had been made in negotiating settlements among the contending parties. The court then stated that it was prepared to make a preliminary finding that there was a material nondisclosure in the WCI Group disclosure materials. At that point, AMP's counsel, who had not been present when the terms of the Neptune/ACS business relationship were discussed in the closed hearings the day before, rose to insist that no final decision should be made in advance of a full airing of the issues. In addition, he offered on behalf of AMP to contribute up to $3 million from its distributions under the WCI Plan to allow the general nonpriority unsecured creditors, other than Alcatel which would agree to stand pat with its 82.5% settlement distribution, to receive a distribution of 100% of their allowed claims (the "AMP Proposal"). With that offer, AMP's position was that unless further evidence established collusive bidding or unlawful conduct in these cases, any nondisclosure of information could not appropriately be characterized as material. The United States Trustee echoed AMP's conclusion that further testimony should be taken to obtain a full airing of relevant evidence.

Thereafter, Mr. Maib testified at length about his strategy and procedures for marketing the WCI Group. Working with PricewaterhouseCoopers, he identified a list of potential buyers and sent out "teaser letters" to about 50. Approximately 20 signed nondisclosure agreements. However, only about a half dozen performed due diligence. ACS was among them, but Mr. Maib testified that ACS ultimately chose not to bid, because it had limited available capital and primarily was interested in acquiring capacity in the Alaska terrestrial network of the WCI Group only. However, ACS asked for permission to talk with other potential bidders, and Mr. Maib testified that he gave his permission for ACS to talk with Neptune and with Landing

Party, Inc. He also testified that he gave Neptune permission to talk with ACS.

Mr. Maib further testified that ultimately he learned of a business arrangement between Neptune and ACS, but he was not given the details of the arrangement. He testified that Neptune told him that the business deal with ACS was confidential and had no impact on Neptune's proposed bid for the WCI Group. He also testified that he discussed the existence of a Neptune/ACS business relationship with representatives of the United States Department of Justice, who advised that they had no concerns about the Neptune/ACS business relationship, with respect to which they had received documents.

Mr. Maib further testified that he was seeking a transaction that would provide the highest and best value with reliability of closing. He considered the Neptune proposal as providing significant and very positive value and a very high degree of certainty. He testified that he did not disclose the Neptune/ACS business relationship in the WCI Group disclosure statement for three reasons: (1) he was not aware of the details of the relationship; (2) he understood that the Neptune/ACS business relationship was subject to confidentiality agreements; and (3) in light of the fact that most of the creditors would not have a continuing relationship with the reorganized debtors, he believed the Neptune/ACS relationship would have "very little impact on meaningful disclosure to creditors." Tr., Vol. 6, p. 859.

Mr. Maib further testified on cross-examination that in putting bidders together, he was attempting to play likely potential bidders-GCI, Neptune and ACS-off against one another in trying to manage the bidding process.

■ "Good faith in proposing a plan of reorganization is assessed by the bankruptcy judge and viewed under the totality of the circumstances. *In re Jorgensen,* 66 B.R. 104, 108–109 (9th Cir. BAP 1986). Good faith requires that a plan will achieve a result consistent with the objectives and purposes of the Code. *In re Jorgensen,* 66 B.R. at 109. It also requires a fundamental fairness in dealing with one's creditors. *Id." In re Stolrow's, Inc.,* 84 B.R. 167, 172 (9th Cir. BAP 1988). *See also, e.g., In re Corey,* 892 F.2d 829, 835 (9th Cir.1989) ("The ... plan appears to be a fair and well-reasoned effort to end the years of litigation surrounding the Corey and Ellis bankruptcies; it results in payment in full of all creditors, with a substantial portion of the estate remaining in the debtor, an uncommon result in bankruptcy proceedings."); *In re Boulders on the River, Inc.,* 164 B.R. 99, 103–04 (9th Cir. BAP 1994); and *In re General Teamsters Warehousemen and Helpers Union Local 890,* 225 B.R. 719, 728–29 (Bankr.N.D.Cal.1998).

In these cases, I find that Mr. Maib made an error in judgment in not fully investigating the business arrangement between Neptune and ACS and failing to disclose it in the WCI Group disclosure statement. However, I further find that Mr. Maib was motivated throughout by his objective to obtain the highest and best possible deal with a high likelihood of closing for the benefit of the WCI Group creditors. I found his testimony with respect to his actions in marketing the WCI Group and dealing with Neptune and ACS to be credible. He took the steps he determined to be appropriate to preserve value for the WCI Group creditors. I find that he acted in good faith and consistent with his fiduciary duties in the interests of the WCI Group creditors.

I also find that with the AMP Proposal, the nondisclosure was not material. The resulting WCI Plan, as amended to encompass the AMP Proposal, pays the general

nonpriority unsecured creditors of the WCI Group a projected 100% of their allowed claims. All parties who addressed disclosure issues at final argument, including the chair of the Creditors Committee, other than Notesan, urged confirmation of the WCI Plan, and characterized the nondisclosure of the Neptune/ACS business arrangement as not material to their votes with respect to the WCI Plan. The WCI Plan further encompasses agreed settlements with all other creditor constituencies, while preserving Notesan's rights to pursue its direct claims against AMP. I find that the WCI Plan, as amended, viewed in the totality of the circumstances of these cases, provides results that are consistent with the purposes of the Bankruptcy Code and is fundamentally fair in its treatment of the WCI Group's creditors. I find that the WCI Plan has been proposed in good faith and not by any means forbidden by law.[16]

*Results under the WCI Plan v. Chapter 7 Liquidation*

Under § 1129(a)(7), in order to confirm the WCI Plan, I must find either that each impaired class of claims or interests has accepted the plan or will receive under the plan at least as much as the subject class of claims or interests would receive in a hypothetical chapter 7 liquidation.

WCI Plan class acceptances are discussed under "Ballot Summaries" at pp. 466–67 *supra.*

The WCI Group's liquidation analyses are set forth in WCI Exs. 19 and 21. Mr. Maib discussed both exhibits during the course of his testimony. He personally participated in the preparation of both exhibits.

Ex. 21 sets forth a continuum of potential results for unsecured creditors in chapter 7, moving from best case scenarios to worse case scenarios, assuming equitable subordination of AMP's claims and assuming no equitable subordination of AMP's claims in the best and worse cases. In the best case scenario, assuming equitable subordination of AMP's claims, general nonpriority unsecured creditors could receive up to 100% of their allowed claims. However, Mr. Maib considered such a scenario very unlikely, particularly in light of the potential for AT & T to claim that the approved AT & T settlement could not be implemented because a chapter 7 trustee could not provide adequate assurances of performance by the WCI Group of their long term obligations under the AT & T settlement. He testified that the worse case scenarios, projecting dividends to unsecured creditors of 59% of their claims if AMP's claims were subordinated and 7% of their claims if AMP's claims were not subordinated, were more likely scenarios, and I found his testimony and reasoning to be persuasive.

Interest holders would receive nothing for their interests in a chapter 7 liquidation under any scenario. *See* WCI Exs. 19 and 21. I find that conclusion supported by the evidence in the record.

Under the WCI Plan, as amended to encompass the AMP Proposal, general nonpriority unsecured creditors in each of the WCI Group chapter 11 cases are projected to receive a dividend of 100% of their allowed claims. In these circumstances, I find that nonaccepting impaired classes of claims and interests would receive amounts under the WCI Plan that

---

**16.** Since the AMP Proposal does nothing but enhance the treatment afforded to general nonpriority unsecured creditors under the WCI Plan, I find it appropriate to treat all such creditors who originally voted in favor of the WCI Plan to have voted in favor of the WCI Plan as amended to incorporate the AMP Proposal, pursuant to Fed.R.Bankr.P. 3019.

are not less than they would receive in chapter 7, and the requirements of § 1129(a)(7) are satisfied.

### Feasibility

Under § 1129(a)(11), in order to confirm the WCI Plan, I must find that it is feasible with confirmation not likely to be followed by the liquidation or need for further financial reorganization of the reorganized WCI Group entities.

▮▮▮▮▮ I am not required to determine that future commercial success for a reorganized debtor is inevitable in order to find that a reorganization plan in chapter 11 is feasible.

"Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11). Most debtors emerge from reorganization with a significant handicap. But a plan based on impractical or visionary expectations cannot be confirmed.... All that is required is that there be reasonable assurance of commercial viability." *In re The Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986).

*See also In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir.1986); *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir.1985) ("The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."); and *In re Sagewood Manor Assoc. Ltd. Partnership*, 223 B.R. 756, 762–63 (Bankr.D.Nev.1998) ("While a reviewing court must examine 'the totality of the circumstances' in order to determine whether the plan fulfills the requirements of § 1129(a)(11), ... only 'a relatively low threshold of proof [is] necessary to satisfy the feasibility requirement.' ... The key element of feasibility is whether there exists a reasonable proba-bility that the provisions of the plan of reorganization can be performed.").

▮▮▮▮ Factors that the court should consider in evaluating evidence as to feasibility include "(1) the adequacy of the financial structure; (2) the earning power of the business; (3) economic conditions; and (4) the ability of management." *In re Agawam Creative Marketing Assoc. Inc.*, 63 B.R. 612, 619–20 (Bankr.D.Mass.1986) *quoting from In re Merrimack Valley Oil Co., Inc.*, 32 B.R. 485, 488 (Bankr.D.Mass.1983).

▮▮▮ Under the WCI Plan, in light of the proposed $1.4 million settlement with DeJon Corporation, the purchase price to Neptune is $43.75 million, plus $700,000 (one half the cost of the proposed DeJon Corporation settlement), or a total of $44.45 million. Neptune has funded $5,000,000 escrow deposit. The President and Chief Executive Officer of Neptune Communications, LLC, Donald J. Schroeder ("Mr. Schroeder"), testified that at the time Neptune submitted bid during the WCI Group auction process, Neptune provided an equity financing commitment letter in the amount of $33 million. He further testified that upon confirmation of the WCI Plan, Neptune would be capitalized at approximately $50 million with approximately $35 million in contributions committed from the Carlisle Group and $15 million from the ACS loan. He also testified that he was contributing $1 million of his own money to the transaction.

Brook Coburn, a Managing Director of the Carlisle Group, testified that the Carlisle Group had a legally binding commitment to contribute $35 million to fund Neptune's capital requirements to purchase the WCI Group assets. He further testified that the Carlisle Group had targeted an additional $20 million for Neptune's financing should the need arise.

Wayne Graham, a principal of ACS, testified that ACS was committed to loaning $15 million to Neptune. At final argument, counsel for ACS confirmed that ACS' commitment to lend the $15 million was not conditioned on receipt of any regulatory approvals.

Mr. Schroeder testified as to his substantial experience and the substantial experience of the other members of the Neptune management team, both in the telecommunications industry generally and particularly regarding the telecommunications business in Alaska.

Mr. Schroeder also testified as to the assumptions behind the cash based projections for the reorganized WCI Group, admitted as WCI Ex. 27. He estimated in projecting income that the reorganized WCI Group ought to be able to capture 75% of incremental demand in the relevant market. Mr. Schroeder expressed his confidence that the reorganized WCI Group, operating under the Neptune management team, could meet the WCI Ex. 27 projections and would experience no further need for financial reorganization.

Finally, Mr. Schroeder testified that Neptune had obtained all required federal and state regulatory approvals to acquire and operate the reorganized WCI Group. Accordingly, Neptune had waived any regulatory approval contingency to closing the purchase of WCI Group assets upon confirmation of the WCI Plan.

Notesan raised two primary objections to feasibility of the WCI Plan: (a) in cross-examination of Mr. Schroeder, Notesan questioned the soundness of the WCI Ex. 27 projections; and (b) Notesan questioned whether regulatory approvals might be revisited and revoked in light of a failure to disclose the business relationship between Neptune and ACS.

Notesan's challenge to the reorganized WCI Group pro forma financials focused primarily on three points. First, Neptune's financial projections do not tie into the WCI Group financial statements. Mr. Schroeder testified that the WCI Group's historical financial performance had been taken into account in preparing the projections. That said, it is not particularly surprising that projections prepared on a cash basis as at July 1, 2002, would not tie into the last WCI Group financial statements, prepared consistently with generally accepted accounting principles as at December 31, 2001. Second, if ACS exercises its option to acquire the Alaska Assets, the income included on the projections from those assets would disappear, and that potential loss of income is not accounted for in the projections. Finally, the accounting for long-term capacity sales income and liabilities is not clear.

The projection of future business income and expense is not an exact science. Accordingly, at best, projections provide no better than an estimate of future financial performance of an enterprise. The failure to account for the potential loss of income from exercise of the ACS option is a defect in the reorganized WCI Group pro forma financial statements. In addition, to hear from Mr. Schroeder that the accounting treatment of long term capacity sales earnings and expense in the telecommunications industry is an "evolving concept" does not exactly inspire confidence in the era of Enron-style off balance sheet accounting.

Nevertheless, Mr. Schroeder's base income assumption that the reorganized WCI Group can capture 75% of incremental demand in the relevant marketplace appears plausible. Mr. Schroeder testified as to his understanding that the GCI cable system cost about $125 million to complete. Under the WCI Plan, Neptune would ac-

quire the WCI Group fiber optic cable network for less than 50% of GCI's investment. That significant cost advantage reasonably ought to provide Neptune with substantial competitive business opportunities, translatable into the capture of a majority of incremental demand, as projected by Neptune.

Since Neptune has waived the regulatory contingency to closing of its purchase of WCI Group assets, Notesan's regulatory approval objection is essentially a rearguard action: Neptune might be able to close following confirmation of the WCI Plan, but its regulatory approvals might be revoked by the FCC and/or the Regulatory Commission of Alaska ("RCA") based upon the failure of Neptune to disclose its business relationship with ACS, resulting in curtailment of the business operations of the reorganized WCI Group to their substantial financial detriment.

Jeffrey Mayhook, Notesan's regulatory expert, testified that in his opinion Neptune's failure to disclose the existence of the ACS Memorandum of Understanding in Neptune's regulatory applications before the FCC and the RCA was a material omission that could result in the imposition of sanctions in both forums.

Mr. Maib previously had testified that he had been informed by the Department of Justice that the work of its telecommunications task force was coordinated with the FCC and that the Department of Justice was aware of the business relationship between Neptune and ACS. On that basis, and further based on the advice of his counsel who previously had practiced before the FCC, Mr. Maib determined that no follow-up with the FCC regarding regulatory concerns was required.

Mr. Mayhook testified that the concerns of the Department of Justice, focusing on mergers and acquisitions, would not necessarily be the same concerns as those of the FCC. He further testified that the rights of ACS under the Memorandum of Understanding with respect to pricing, particularly in light of ACS' very strong position as a competitor in the Alaska marketplace, likely would trigger heightened scrutiny by the RCA of final approval of the Neptune application(s) for authority. However, although he testified that the appointment of a receiver, among other things, was a possible sanction that could be imposed by the RCA, Mr. Mayhook thought that an order shutting down operations of the reorganized WCI Group fiber optic cable network would be unlikely.

In light of the foregoing record from the evidence presented, I find that Neptune will be funded with adequate capital to fund the distributions required under the WCI Plan, and that Neptune and the reorganized WCI Group will have access to adequate capital resources to fund their operations going forward. I find that in spite of the deficiencies of the WCI Ex. 27 pro forma financial statements for the reorganized WCI Group, the reorganized WCI Group entities have substantial income potential arising from their relatively low cost acquisition of the WCI Group fiber optic cable network, that should give them a competitive advantage to capture a majority share of incremental demand in the relevant marketplace. The reorganized WCI Group may not realize the income projected in the pro forma financial statements, but I find that they have a reasonable shot at attaining commercial viability. I find that the reorganized WCI Group should benefit from the operational experience of the Neptune management group, both in the telecommunications industry generally and in the Alaska marketplace in particular. I find that since Neptune has waived regulatory approval as a contingency to closing the transaction provided for in the WCI Plan, if I confirm the

WCI Plan, Neptune's purchase of the WCI Group assets is likely to close. Based on the record presented in these cases, I have no basis to determine what sanction(s), if any, the FCC or the RCA might impose as a result of a failure by Neptune to disclose the existence or substance of its business relationship with ACS in regulatory applications. However, I find that it is not likely that the WCI Group fiber optic cable network would be shut down. Accordingly, I find that confirmation of the WCI Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the reorganized WCI Group.

In light of the foregoing findings, I find that the WCI Plan is feasible for purposes of § 1129(a)(11).

### *Cramdown*

■ Since the class of general nonpriority unsecured creditors in the WorldNet case, Class 9.2, did not vote to accept the WCI Plan (*see* Ballot Summary discussion at p. 467 *supra*), the requirement of § 1129(a)(8) that all classes of impaired claims accept the WCI Plan has not been satisfied. Accordingly, if I am to confirm the WCI Plan, I must find that the requirements of § 1129(b) are satisfied.

Section 1129(b) provides that if all requirements of § 1129(a) are satisfied other than § 1129(a)(8), a chapter 11 plan still may be confirmed over the rejection of an impaired class of unsecured claims if the plan does not discriminate unfairly and is "fair and equitable" in its treatment of such class.

In these cases, the WCI Plan, as amended to include the AMP Proposal, provides that the Class 9.2 general unsecured creditors will receive the same treatment as every other class of general nonpriority unsecured claims: their allowed claims are projected to be paid in full on the same basis and at the same times as are all other allowed general nonpriority unsecured claims. Accordingly, I find that the WCI Plan does not discriminate unfairly against the Class 9.2 WorldNet general unsecured claims.

The "fair and equitable" standard requires either: (1) that the holders of Class 9.2 claims receive or retain on account of their claims property equal to the allowed amounts of their respective claims as of the effective date of the WCI Plan; or (2) no claimant of a class of claims or interests junior to the Class 9.2 claims will receive or retain anything under the WCI Plan. Since the Class 9.2 claimants are projected to receive payment of 100% of their allowed claims under the WCI Plan, as amended, I find that the first alternative for satisfaction of the "fair and equitable" standard likely is satisfied. However, in any event, no claimant or interest holder with a priority junior to the Class 9.2 claimants is receiving anything under the WCI Plan. Accordingly, I find that the second alternative standard for "fair and equitable" treatment of Class 9.2 is satisfied under the WCI Plan as well.[17]

---

**17.** Notesan may argue that the recovery by general nonpriority unsecured creditors of 100% of their allowed claims is only a projected estimate under the WCI Plan, and AMP, with what Notesan regards as a claim that should be treated solely as an equity interest, may receive some payment before the Class 9.2 claimants receive payment in full in violation of the "fair and equitable" standard. However, based upon my approval of the AMP Settlement, as discussed at pages 473–74 *supra,* to the extent that AMP receives distributions under the WCI Plan, any such distributions will be made with respect to AMP's allowed general nonpriority unsecured claim, which though effectively subordinated, is of equal priority with the claims of Class 9.2 creditors. The WCI Plan provides for no distributions to interest holders.

*Ultimate Findings on Confirmation*

Conditioned upon the WCI Group amending the WCI Plan as required to meet the requirements of § 1129(a)(1), as set forth at p. 481 *supra*, I find that the WCI Plan satisfies all of the requirements for confirmation set forth in § 1129(a), other than the requirement of § 1129(a)(8) regarding acceptance by all impaired classes of claims with respect to Class 9.2. I further find that the requirements for cramdown under § 1129(b) with respect to Class 9.2 have been satisfied. Accordingly, I will confirm the WCI Plan. Counsel for the WCI Group should prepare and submit an appropriate form of Confirmation Order. The court will prepare an order denying Notesan's Motion for Partial Judgment.